[Crim. No. 1427. Fourth Dist. Sept. 7, 1960.]

THE PEOPLE, Respondent, v. WILLIS CICERO JONES, Appellant.

Gladys Towles Root, Eugene V. McPherson and Robert Barnett for Appellant.

Stanley Mosk, Attorney General, S. Clark Moore, Deputy Attorney General, James Don Keller, District Attorney, and James J. Biggins, Deputy District Attorney, for Respondent.

SHEPARD, J.—Defendant was tried before a jury and convicted of the crime of murder. The jury fixed the degree at first degree and refused to impose the extreme penalty. He was sentenced to imprisonment for the term provided by law. He appeals from the judgment of conviction and from the order denying his motion for a new trial.

ACCIDENT INSTRUCTION NOT JUSTIFIED BY EVIDENCE

Defendant first complains that the court erred in refusing to instruct the jury to the general effect that when a person commits an act through misfortune or by accident under circumstances that show no evil design, intent or culpable negligence, he does not thereby commit a crime.

The uncontradicted testimony shows that on October 17, 1958, defendant had been married to Waltela Anna Jones (deceased victim) about six years. For more than two years prior to the above date, defendant had had various discussions with her about her claimed associations with other men, defendant urging her to quit her employment in order to terminate these associations. She refused. Ultimately she moved to a separate domicile (with defendant's assistance) and commenced a divorce action against defendant, which divorce action was pending on said date. Defendant became especially suspicious of one Clem Sonoqui. The evening of October 17, defendant was suspicious that the victim and Sonoqui were about to keep a clandestine rendezvous, defendant knew not where. Defendant identified the automobile victim was driving, which was parked near a bowling alley. He went back to his home, secured his 7.35 calibre Italian military rifle, put six rounds of cartridges loaded with lead core, expanding bullets, in the magazine and threw one into the firing chamber. He put another clip containing six rounds of the same ammunition in his pocket. He returned to the location of the victim's automobile and sometime prior to 9 p. m. concealed himself in its trunk compartment and closed but did not lock the lid. The victim eventually drove the car to her home, arriving some few minutes prior to 9 :30 p. m. Shortly after the victim left her car and entered her apartment, defendant opened the trunk lid, left the car, and proceeded directly to the front door of the apartment. He attempted to enter the door, then smashed out the screen and glass of a window adjacent thereto, and entered the living room of the victim's apartment.

From this point on there was conflict in the evidence, but defendant's own story is that the gun was cocked and defendant thinks the safety was off when he went through the window; that he saw the victim coming into the living room from either the bathroom or the hallway; that defendant said nothing; that the victim started screaming and grasped the gun; that they struggled around the room, defendant trying to regain exclusive possession of the gun; that defendant

jerked the gun and it went off, the bullet striking the victim; that she fell down, the blood running from her body (she later died from this wound, which was through the heart); that defendant's intent was to fire eight or ten shots near the feet or over the head of Sonoqui and give him a good scare; that he never intended to kill his wife; that the discharge of the rifle was an accident; that he took the gun along because he felt physically unable to cope with Sonoqui; that he believed Sonoqui was in the apartment; that immediately after the victim's car stopped, while defendant was still in the trunk compartment, he heard another car drive up and stop; that he heard voices which he did not identify; that the voices drifted away.

Under defendant's own story, he could have been guilty of no lesser crime than manslaughter. He had a loaded deadly weapon, he intended to shoot it near the feet or over the head of Sonoqui. In the nighttime he forcibly and violently broke into a dwelling without warning and without the consent of the occupant. He had a loaded and cocked rifle in his hand. His whole story displays a series of unlawful acts from which the death clearly resulted.

At the very least this series of unlawful acts shows forcible entry (Pen. Code, §§ 418, 603), exhibiting a deadly weapon in a threatening manner (Pen. Code, § 417) and disturbing the peace (Pen. Code, § 415). From these acts the homicide flowed clearly and in continuous sequence. From these facts no lesser crime could have been found than manslaughter. (*People* v. *McGee*, 31 Cal.2d 229, 238 [8] [187 P.2d 706]; *People* v. *Barnett*, 77 Cal.App.2d 299, 304 [3-4-5] [175 P.2d 237].).

The refusal to instruct on a theory not supported by the evidence is not error. (*People* v. *Stembridge*, 99 Cal.App. 2d 15, 21 [1] [221 P.2d 212]; *People* v. *Garcia*, 124 Cal.App. 2d 822, 828 [7] [269 P.2d 673]; *People* v. *Sanchez*, 30 Cal.2d 560, 567 [1] [184 P.2d 673].)

#### ENTRY INTO DWELLING UNLAWFUL

Defendant next contends that the trial judge committed prejudicial error in commenting:

"Now as far as this apartment of the deceased is concerned, Ladies and Gentlemen, that was her home. That was the place where she had a right to be without molestation. A person's home is a person's castle. No one had a right to enter that home without her permission. Even law enforcement officers

had no right to go into that apartment without her permission unless they had a search warrant, and she had a right to be there. As far as the evidence shows she was in there alone, as far as I can determine, and that was her right. And if she struggled when she found someone in her apartment, put yourself in her position and the defendant's position and see what you would have done.''

Defendant claims this instruction deprived him of his theory of accident and that the way he entered the apartment was a jury question. He appears to theorize that he had reasonable grounds to believe a crime (adultery) was being committed in the apartment and that he was clothed with the power of a police officer in forcing entrance. Neither the evidence nor the law justify any such conclusion. Defendant himself testified that the victim was alone in her car from the bowling alley to the apartment; that a car drove up after the victim stopped at the apartment; that after the victim got out he heard voices; that he did not identify them as either the victim's or Sonoqui's voices; that the voices faded away. The evidence shows without conflict that he was acquainted with the apartment house. He does not claim that the voices proceeded in the direction of the victim's apartment. He does not claim that Sonoqui's car was parked at or near the apartment when defendant got out of the trunk compartment. He does not claim that he saw or heard another man inside the apartment. He does not claim to have overheard or been informed of a rendezvous between the victim and Sonoqui at the apartment. He did not even demand entrance nor state to the victim his purpose of entry. In short, his actions were based on nothing but his inordinate suspicions, and not on any known facts which would have led any reasonable person to his claimed belief. Even had he been clothed with the rights of a police officer, he had no reasonable cause to break in and, in any event, not in the unlawful manner he chose.

The court's statement may not have been phrased in the best of language, but it did not transcend the limitation of the evidence nor the law. Defendant quotes comments of the court made during the motion for a new trial, but they are of no help to defendant on this score. They were not made to the jury. We find no prejudicial error.

The general substance of the other evidence presented by the prosecution is as follows: The testimony of various neighbors showed that the victim was screaming almost continuously; that defendant was at one time striking her with his

left hand, she holding up her hands in defense, and she did not then have hold of the gun; that the gun was brought up toward the firing position while defendant was in exclusive control of it, the witness then dodged, the shot came immediately, almost striking the witness; at another point defendant held the victim with his left hand, pulling her toward the kitchen, he held the gun in his right hand; at another point the victim and defendant were standing very close together, the witness could not see their hands; that the defendant was standing over her, she was lower than defendant, the witness not being sure whether or not she was on her knees, that she was pleading, "No, oh my God, no," the witness was unsure of other words but thought they were "Think of your daughter"; others heard the victim scream: "God help me. Someone help me. Leave me alone."; that after the shooting defendant said: "Well, I told her if she wouldn't stop fooling around I was going to stop her."; that defendant appeared to be very calm; that defendant stated he had been trying for two or three years to get her and that he finally had; and that the officers were called while she was screaming.

The testimony of the officers revealed statements of defendant such as: "I thought I would catch them both together. I meant to kill them both." To another officer defendant stated that he had intended to get both Sonoqui and the victim and further stated: "I am sorry I killed her. I meant to get Clem first." To another officer he said: "I told her I would do it."

No identifiable fingerprints were found on the gun. Powder marks were found on the victim's hands. These powder marks, in the opinion of an expert, could not have come from the breech of the rifle, but must have come from the muzzle blast. There were no powder burns on the victim's blouse where the bullet entered. In the opinion of an expert, the muzzle must have been more than 12 inches away from the blouse or it would have produced powder burns.

There was no trace of Sonoqui having been in the apartment. There was no other doorway than the front doorway. All screens on the windows were intact except the one broken by defendant. Defendant, in addition to his testimony hereinbefore recounted, claimed he did not intend to shoot the victim, that the shot occurred when he jerked the gun while they were struggling for it, that he believed Sonoqui was in the apartment. A number of witnesses testified to defendant's good reputation for peace and quiet.

### Lying In Wait Instruction Proper

■ Defendant complains of the instruction of lying in wait and the statement of the court:

"Then the other statutory first degree thing that you consider is lying in wait. That is getting in the trunk of that car and coming back to the apartment. In that case again I say to put yourselves in the position of the defendant here and put yourselves in the position of the deceased and see what the intent was and the purpose of getting into the trunk of that car. As I was listening to the evidence I was amazed that if the car had hit a bump it might have clicked shut and he couldn't open it from the inside. I don't know, I have never been in the trunk of a car, but I don't think there is any way to open it from the inside if you are in there and hit a bump real hard. I suffer from claustrophobia and I don't like to think of me locked in the trunk of a car. Figure out if you were in the position of the defendant, and so forth, . . ."

Some of this statement was a comment on the evidence but it was not unfair. A portion of this statement was pure ebullience. It might well have been dispensed with, but we are unable to see how it could have harmed defendant. We are here dealing with human beings, not mechanical automatons. The court fully instructed the jury on their exclusive right to weigh the evidence and decide the facts.

The instructions on lying in wait were properly and correctly given.

· ■ "The elements necessary to constitute lying in wait are watching, waiting, and concealment from the person killed with the intention of inflicting bodily injury upon such person or of killing such person." (*People* v. *Atchley,* 53 Cal. 2d 160, 175 [18] [346 P.2d 764].)

■ From the facts present in the case at bar, the evaluation of testimony was clearly within the province of the jury and evidence was sufficient for them to have found that the killing was directly connected with the defendant's acts and intent in concealing himself in the victim's car. (*People* v. *Byrd,* 42 Cal.2d 200, 208 [4a-5-4b] [266 P.2d 505]; *People* v. *Sutic,* 41 Cal.2d 483, 492 [5] [261 P.2d 241].)

### Preliminary Instructions Proper

Another complaint of defendant is that the court preliminarily instructed the jury, at the commencement of the trial, on matters which were not then in evidence. Defendant does not contend that the instructions were not correct nor

that the matters to which they referred did not, in fact, come into evidence during the trial. He claims, however, they placed undue emphasis on conviction.

Penal Code, section 1093, subdivision 6, provides in part: "At the beginning of the trial or from time to time during the trial, and without any request from either party, the trial judge may give the jury such instructions on the law applicable to the case as he may deem necessary for their guidance on hearing the case." Calling the attention of the jury at the commencement of the trial, to legal problems to be met, if fairly done, may be of great value in enabling the jury to understand the purpose and thus properly evaluate various bits of the evidence. The law authorizes it. (*People* v. *Frazier,* 88 Cal.App.2d 99, 105 [6] [198 P.2d 325].)

 In the case at bar, the preliminary instructions called to the attention of the jury that they must not be swayed by passion or prejudice nor biased because of the charge against or arrest of defendant; that they must be governed solely by the evidence and to consider all of it; that the court has the obligation to state the law; that the jury has the exclusive province of weighing the evidence and evaluating the testimony; on the proper impartiality of approach by the jurors; on the presumption that defendant is innocent; on reasonable doubt; calling of witnesses; kinds of evidence, direct and circumstantial; motive; how to judge witnesses and their testimonial weight; expert witnesses; that they must not suffer themselves to be influenced by any apparent favoritism by the judge; the function of the charge and the plea; definition and elucidation of murder, first and second degree; manslaughter; malice; lying in wait; burglary; intent; and deliberation. We see nothing unfair to defendant, nor any undue emphasis, in these preliminary instructions.

### EVIDENCE EXCLUSION NOT PREJUDICIAL

 Defendant further complains that certain evidence of a witness (Mrs. Ayers) was excluded as immaterial. The offer of proof in this respect related in large part to a recital of specific instances of impropriety on the part of Sonoqui in making personal advances to different women, including Mrs. Ayers. To this extent the offered evidence was clearly immaterial, as proof of specific acts towards others than defendant's wife could reasonably have no bearing on his state of mind. (*People* v. *Keys,* 62 Cal.App.2d 903, 912 [1] [145

P.2d 589]; *People* v. *Wong,* 83 Cal.App.2d 60, 69-70 [187 P.2d 828]; *People* v. *Soules,* 41 Cal.App.2d 298, 306 [106 P.2d 639].) While the cases cited relate to assault, the same rule reasonably applies to the type of situation here at bar insofar as it relates to other women.

Mixed into the offer of proof there was reference to some sort of information to defendant of Sonoqui's purported advances to the victim. This evidence seems to have been offered in support of defendant's alternate theory that the killing was done in the heat of passion and without premeditation, and was therefore manslaughter. As a general rule a defendant is entitled, as a matter of right, to introduce evidence in support of any legitimate theory of defense. Evidence to show information to a defendant that might have reasonably caused in him "heat of passion" is a recognized vehicle of defense where it is sought to reduce the crime from murder to manslaughter. However, in view of the time elements involved in the case at bar, such theory was of doubtful validity, to say the least. (*People* v. *Boggess,* 194 Cal. 212, 235 [15-16] [228 P. 448]; *People* v. *Ashland,* 20 Cal.App. 168, 175 [128 P. 798]; *People* v. *Danielly,* 33 Cal.2d 362, 377 [3-4] [202 P.2d 18].)

 Furthermore, the offer of proof did not contain any suggestion that defendant had been informed by this witness that the victim and Sonoqui were to keep a rendezvous at any specific time or place, and most particularly did not make any suggestion about a rendezvous at the time and place here involved, nor does the offer of proof suggest Sonoqui was visiting or about to visit the victim in the victim's apartment. Defendant himself testified at length on his information relating to far more extensive material than that proposed to be related by Mrs. Ayers. Nowhere was there any evidence offered by the prosecution to rebut this particular phase of defendant's testimony. It is true that the district attorney did dispute defendant's motives and conclusions and, also disputed the intention claimed by defendant, but nowhere, not even in his argument, did he dispute that defendant had information regarding the victim and Sonoqui as testified to by defendant. In this state of the record, we can find no prejudice, as defendant's statements of his suspicions regarding Sonoqui were thoroughly presented to the jury by defendant and repeated to them through defendant's statements to the police officers. Other evidence on the point would have been merely cumulative.

## There Was No Miscarriage of Justice

The evidence of defendant's guilt is overwhelming. The deliberate preparation of the weapon, the hiding in the trunk of the victim's car, the testimony of the various neighbors relative to the breaking and entering, what some of them saw and heard before and after the time of the shooting, defendant's statements to them and to the police officers immediately after the shooting, the powder marks on the hands of the victim plus the absence thereof on the victim's blouse at the point of bullet entrance, all present a picture of premeditation and intent from which the jury was amply justified in their findings of first degree murder.

Furthermore, the jury was amply justified in believing that the breaking into the house was accompanied by an intent to commit a felony therein. If the jury was convinced that this was true, then the entry constituted a burglary and the killing in the course thereof would be murder in the first degree by mandate of statute, without any further showing of specific intent to kill the victim, and it would be immaterial that the victim was Mrs. Jones rather than Sonoqui, or that his real intent was to assault Sonoqui with a deadly weapon instead of the victim. The killing would be murder in the first degree by the mandate of Penal Code, section 189, regardless of whether it was accidental or intentional. (*People* v. *Morlock,* 46 Cal.2d 141, 146 [6] [292 P.2d 897].)

On appeal, "if the circumstances reasonably justify a verdict of guilty by the jury, an opinion of the reviewing court that those circumstances might also be reasonably reconciled with the innocence of the defendant does not warrant a reversal of a verdict of guilty by the jury." (*People* v. *Merkouris,* 52 Cal.2d 672, 678 [1] [344 P.2d 1].)

We are unable, after examining the entire record of this cause, to say that "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error," if any. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) We are of the opinion that there was no miscarriage of justice. (Cal. Const., art. VI, § 4½.)

The judgment and order denying defendant's motion for a new trial are affirmed.

Griffin, P. J., and Coughlin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 26, 1960.