[Crim. No. 9317.   In Bank.   May 24, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT PAGE ANDERSON, Defendant and Appellant.

Robert Page Anderson, in pro per., and Rufus W. Johnson, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James and Albert W. Harris, Jr., Assistant Attorneys General, S. Clark Moore, Edward P. O'Brien and Michael R. Marron, Deputy Attorneys General, for Plaintiff and Respondent.

McCOMB, J. — This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment, after trial before a jury, on verdicts finding defendant guilty of (a) murder of the first degree, (b) attempted murder of three men, and (c) robbery of the first degree, and imposing the death penalty.

*Facts*: About 10 a.m. on April 8, 1965, defendant entered a pawnshop in San Diego attended by two employees, Theodore Swienty and Louis Richards. He had less than $2.00 in cash and a diamond ring on which he still owed approximately $60 on a conditional sales contract and for which he realized he could obtain only about $10 cash.

Defendant first asked for .30-.30 ammunition, and when Swienty informed him that he had none, defendant inquired about some rifles on display. At defendant's request, Swienty removed from its case a Remington .30-06 with a telescopic sight attached and handed it to defendant for inspection. After examining the gun, defendant asked its price and was told it was $105. Defendant remarked that the price was quite steep, but declared, "I'll take it." He then asked for a box of shells, which Swienty procured and placed on the counter with the gun.

While Swienty was totalling the price of the two items, defendant reached over and seized the gun and ammunition. When Swienty protested, defendant said he wanted to see if

the shells fit and started loading the gun as he backed away from the counter. Swienty moved toward defendant, but halted when he heard the rifle bolt slam shut and found himself staring into the barrel of the gun. Pointing the loaded rifle at Swienty from point blank range, defendant said, "I'm going to blow your brains out, you son of a bitch."

The other salesman, Richards, said to defendant: "If you want it, you can have it. Take it and go." As defendant swung the gun away, Swienty ducked for cover below the counter and heard Richards exclaim, "Don't shoot," followed almost immediately by a rifle blast.

A passer-by, Antonio Cidot, witnessed the murder. He heard the rifle blast and saw Richards fall to the floor, face down, near the open doorway of the pawnshop.

After the fatal shot was fired, Swienty came from behind the counter where he had taken refuge and ran up some stairs to another portion of the shop. As he reached the top of the stairs, he heard another shot fired in the room behind him. He then ran through the upstairs storage rooms to the front of the building, opened a window, and shouted for the police.

Hearing footsteps on the stairs, Swienty fled to the rear of the building and hid under a bed in a small, darkened room. He heard someone walking stealthily within a few yards of his hiding place and heard him mutter, in a voice which he recognized as that of defendant, "He ain't here. Son of a bitch."

The footsteps retreated, and for the next four hours, as he lay beneath the bed, Swienty heard shots fired from within and without the building, and heard several calls from the street advising defendant to come out of the shop with his hands up. He also heard both the explosion of grenades and shotgun blasts within the shop, and suffered from the tear gas used by the police.

Officer McClennon, of the San Diego Police Department's burglary detail, arrived on the scene and, hearing that defendant had a gun, immediately took cover nearby. From his vantage point, he observed Officer Duncan edging toward the door of the pawnshop with handgun drawn. He could also see the victim on the floor, and saw defendant inside carrying a rifle with a telescopic sight and moving toward the doorway.

Officer McClennon saw defendant stop as Officer Duncan moved to the entrance of the pawnshop. When the two men confronted each other, defendant raised his rifle and fired at Duncan. Duncan fired back; both men then retreated, neither apparently having been hit.

Sergeant Allen Brown, of the San Diego Police Department, made several appeals over a loudspeaker encouraging defendant to surrender. No response was made to any of these appeals, and the intermittent firing from within the building gave no indication of any intention on defendant's part to surrender.

When both tear gas and concussion grenades failed to flush defendant from the building, Sergeant Brown, in company with other officers, finally entered the shop while sporadic gunfire was coming from within and proceeded toward the rear staircase. As Brown started up the stairs, a shot rang out from the vicinity of the top of the stairs, travelling in his direction. He retreated and shouted to defendant that another concussion grenade would be thrown and advised him to surrender to save his life.

After the grenade was thrown, the sergeant began to work his way up the stairs. Once again a shot rang out, this time quite close to him. He retreated, and then started back up the stairs. As he reached the top, he heard a metallic click, which sounded like a trigger, and, looking in the direction of the sound, saw defendant crouched with a pistol in his hand in a nearby darkened room. He pursued defendant to a rear storage area, where he felled him with a shot and apprehended him.

Defendant was wearing an empty gun belt, and on the floor beneath him were two handguns. Several rifles, a shotgun, and other handguns were found strewn about both the main part of the shop and the upper floor. These weapons had previously been in their proper storage cases; defendant had smashed the top of a glass storage case to obtain the handguns. The murder weapon was recovered on the second floor, and various types of live and expended ammunition were found on both floors.

Several large denomination keys had been depressed on the cash register. Before the murder the last cash register transaction had been $3.00, and the large denomination keys had not been depressed that day prior to the shooting.

Defendant admitted he saw Swienty run up the rear staircase of the shop and admitted following him; he admitted punching the cash register keys in an attempt to break in and obtain money; he admitted shooting the box of ammunition taken with the murder weapon, taking rifles from the racks on the second floor, and breaking into the glass pistol case; and he admitted firing at Officer Duncan, but said he did not

attempt to hit him but was, rather, trying to keep him from entering the pawnshop.

■ *Questions*: First. *Was the evidence sufficient to support the robbery conviction?*

*Yes.* From the evidence, the jury could reasonably have found that when defendant entered the pawnshop, he had no intention of purchasing a rifle and ammunition; that once the salesman had produced the desired weapon and ammunition, he took both items without ever having made an offer to pay for them; that when the salesman sought the return of the rifle and the ammunition, he loaded and aimed the weapon at the clerk and threatened him; that in fear of his life, the salesman stopped his attempt to retrieve the merchandise, ducked behind the counter when defendant swung the rifle away from him, and fled up the back steps after the fatal shot at Richards; and that when Richards told defendant he could have the rifle without payment and then pleaded with him not to shoot, he was murdered by a bullet from that same rifle.

Defendant contends that since he obtained possession of the rifle without the use of force or fear, there can be no robbery as a matter of law.

■ In this state, it is settled that a robbery is not completed at the moment the robber obtains possession of the stolen property and that the crime of robbery includes the element of asportation, the robber's escape with the loot being considered as important in the commission of the crime as gaining possession of the property. (*People* v. *Ketchel,* 59 Cal.2d 503, 523 [10] [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Kendrick,* 56 Cal.2d 71, 90 [18] [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Phillips,* 201 Cal.App.2d 383, 385-386 [19 Cal. Rptr. 839]; *People* v. *Reade,* 197 Cal.App.2d 509, 512 [3] [17 Cal.Rptr. 328].)

■ Accordingly, if one who has stolen property from the person of another uses force or fear in removing, or attempting to remove, the property from the owner's immediate presence, as defendant did here, the crime of robbery has been committed.

In *People* v. *Phillips, supra,* 201 Cal.App.2d 383, the defendants drove into a gasoline station with the intention of committing a robbery. The plan was for one of them to order gasoline and detain the attendant at the car, while the other was to pretend to go to the men's room but actually enter the service station and steal the contents of the cash box.

After the attendant had pumped gasoline into the tank, the defendant in the car confronted him with a rifle, saying,

"Move and your [sic] dead." The attendant, in spite of the threats, upon seeing the other defendant rummaging in the office, ran around the back of the car into the office, where a struggle took place. The robber broke loose, and he and his companion drove away, with the attendant calling out to them that they owed $2.98 for the gasoline. They were subsequently charged with robbery for the taking of the gasoline.

Admittedly, no force or fear had been used by the robbers in obtaining possession of the gasoline; the threats, the display of the rifle, and the struggle with the attendant all took place after the transfer of the gasoline to the car. The contention was made that there could therefore be no robbery as a matter of law; but the court affirmed the judgment of conviction, finding no difficulty in upholding the implied finding of the jury that under the circumstances the gasoline was removed from the immediate presence of the attendant by means of force and fear, in violation of section 211 of the Penal Code.

Second. *Did the trial court commit prejudicial error by failing to instruct the jury, on its own motion, as to the requisite force or fear necessary to constitute the crime of robbery?*

*No.* Defendant complains that the court committed prejudicial error in failing to instruct on "requisite force" and the "legal connotation of fear" as necessary elements of the crime of robbery. He does not, however, challenge the content of the robbery instructions given, nor did he request any additional instructions at the trial.

Defendant's contention essentially is that the instructions given needed amplification or explanation; but since he did not request such amplification or explanation, error cannot now be predicated upon the trial court's failure to give them on its own motion. (*People* v. *Reed,* 38 Cal.2d 423, 430 [1] [240 P.2d 590]; *People* v. *Shepherd,* 223 Cal.App.2d 166, 173 [4] [35 Cal.Rptr. 397].)

In the present case, the court properly instructed the jury on the general principles of law governing the count of the indictment charging defendant with robbery.

The law is settled that when terms have no technical meaning peculiar to the law, but are commonly understood by those familiar with the English language, instructions as to their meaning are not required. (Cf. *People* v. *Chavez,* 37 Cal.2d 656, 668 [6] [234 P.2d 632]; *People* v. *Chapman,* 207 Cal.App.2d 557, 578 [22] [24 Cal.Rptr. 568]; *People* v. *Sanderson,* 190 Cal.App.2d 720, 723 [12 Cal.Rptr. 69].)

█ The terms "force" and "fear" as used in the definition of the crime of robbery have no technical meaning peculiar to the law and must be presumed to be within the understanding of jurors.

█ Third. *Did the trial court abuse its discretion by not furnishing the jury with written instructions?*

*No.* Defendant recognizes that furnishing written instructions is a matter within the discretion of the trial court, but urges that in capital cases it should be declared mandatory, upon either the motion of the defendant or the expressed need of the jury, that the jury be given written copies of the instructions to have with them in the jury room.

There is no merit to this contention. Section 1093, subdivision 6, of the Penal Code provides, in pertinent part: "The trial judge *may* cause copies of instructions so given to be delivered to the jurors at the time they are given." (Italics added.)

At the time the instructions were given, no request was made to furnish written copies to the jurors. The first mention of this question came almost six hours after the conclusion of the court's instructions and after the jury had deliberated for some time. Then the jury foreman merely asked, "Are the written instructions available to the jury?" The matter was then discussed by court and counsel in the judge's chambers.

In denying defendant's motion that the jury be furnished written instructions, the court stated that written copies of the instructions exactly as given were not readily available, since they existed only in the court reporter's untranscribed notes, that the amount of time required for transcription was not available, and that the court felt it not advisable to furnish written instructions.

In informing the jury that the written instructions were not available, the trial court offered to reread any instructions the jury might request; and, in fact, the court did reread several of the instructions to the jury.

Clearly, the court did not abuse the discretion granted it under section 1093, subdivision 6, of the Penal Code.

█ Fourth. *Did the trial court err in refusing to give defendant's proposed instruction No. 5?*

*No.* That instruction read: "You are instructed that in order to find the defendant guilty of murder in the first degree as a killing committed in the perpetration or attempted perpetration of robbery, you must find either:

"(1) That the defendant's purpose in seizing the rifle

which is the People's Exhibit No. 34 in evidence was to effect a felonious taking as contained in the definition of robbery previously read to you, or

"(2) That the defendant's intention at or before the slaying was the felonious taking of property other than or in addition to People's Exhibit No. 34 in evidence."

Defendant contends that since his requested instruction was not given, he was not permitted to have the jury properly informed as to what particular finding of facts from the evidence would have to be made in order to constitute the homicide mandatory first degree.

An examination of the instructions given reveals that defendant could not have suffered prejudice by reason of the omission of his requested instruction No. 5, because the instructions given amply covered the legal principles pertinent to the case.

Defendant's proposed instruction No. 5 merely elaborated upon the general instruction concerning section 189 of the Penal Code by dealing specifically with a killing committed in the perpetration, or attempted perpetration, of robbery, and by stating the elements necessary to a finding of robbery or attempted robbery.

The court gave a full and proper instruction covering section 189 of the Penal Code and, in addition, gave full and clear instructions covering the crime of robbery. Those instructions fully and properly informed the jury as to the findings necessary to reach a mandatory first degree murder verdict.

Although defendant's requested instruction may have been a correct statement of the law, the law requires only that the trial court correctly instruct on any points of law pertinent to the issue. (Pen. Code, § 1093, subd. 6.) When the jury is properly instructed as to pertinent legal principles, the court need not restate those principles merely in another way. (*People* v. *Chapman, supra,* 207 Cal.App.2d 557, 579-580.)

Fifth. *Did the trial court commit prejudicial error on the penalty phase of the trial by instructing the jury "in effect" that they were not to be influenced by pity or sympathy?*

*No.* A court may not properly instruct a jury in the penalty phase of the trial that it cannot be influenced by pity for the defendant or sympathy for him. (*People* v. *Polk,* 63 Cal.2d 443, 451 [14] [47 Cal.Rptr. 1, 406 P.2d 641].) However, in the present case the court did not, either in fact or in effect,

so instruct the jury at the conclusion of the trial on the issue of penalty.

The court did instruct the jury prior to its deliberation on the guilt phase of the trial: "Therefore, *in determining the guilt or innocence of the defendant,* you are to be governed solely by the evidence introduced in this trial and the law as stated to you by the Court.

"*For such purpose,* the law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." (Italics added.) This instruction was appropriate on the issue of guilt. (*People* v. *Polk, supra,* at p. 451 [14].)

Two days after the jury had heard all the instructions relative to the guilt phase, the court instructed relative to the penalty phase, commencing the instructions: "In the first phase of the trial, you were given general instructions concerning the standard by which the credibility of the witnesses was to be weighed, including that of expert witnesses. It will not be necessary to repeat at this time the general instructions with those others previously given to you.

"You are reminded that you are to be guided by the previous instructions given in the first phase of this case that are applicable to this phase of this case."

Defendant argues that the jury was thus admonished to be guided by instructions given in the earlier guilt phase of the trial, necessarily including the instruction given relative to pity and sympathy. This contention is without merit.

The instruction given in the guilt phase was clearly limited to the jury's determination of the guilt or innocence of defendant.

The instruction given in the penalty phase made reference *solely to those guilt phase instructions which were applicable to the penalty phase of the case.* The jury could not reasonably have understood the inappropriate guilt phase instruction to be applicable to their deliberations on penalty.

A reading of the portion of instructions given in the penalty phase and quoted above makes clear that the jury could have understood only that the court was referring to those earlier instructions dealing with the credibility of witnesses and the weight and value of evidence.

The court made it absolutely clear that the question of penalty was committed entirely to the judgment and conscience of the jurors based upon their sound and absolute discretion. (See *People* v. *Friend,* 47 Cal.2d 749, 767 [306 P.2d 463].) The court placed no restrictions upon the exercise of

the jury's judgment in the matter.

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.

Appellant's petition for a rehearing was denied July 20, 1966. Peters, J., was of the opinion that the petition should be granted.