[Crim. No. 12873. In Bank. Jan. 21, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM BANDHAUER, Defendant and Appellant.

## COUNSEL

Herbert E. Selwyn, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kallay, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**—A jury convicted defendant of the first degree murder of Walter Ashley Smith, and fixed the penalty at death. On appeal the judg-

ment was reversed insofar as it related to penalty but affirmed in all other respects. (*People* v. *Bandhauer* (1967) 66 Cal.2d 524 [58 Cal.Rptr. 332, 426 P.2d 900].) At the second penalty trial the jury again imposed the death penalty. Motions for new trial and for reduction of the penalty were denied, and defendant's second automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

Defendant's principal contentions relate to the giving of various instructions, certain remarks of the prosecutor in argument to the jury, and the factual basis of the court's ruling on his motion to reduce the penalty. We have concluded that one of these contentions is meritorious and that the judgment imposing the death penalty must be reversed.

The evidence relating to the murder of Smith was substantially the same as that introduced in the first trial, which we summarized as follows in our prior opinion (66 Cal.2d at pp. 526-527):

"Defendant met Smith at Thelma's Tavern in Riverside at approximately 8 p.m. on February 25, 1966. He introduced himself as Mike to Smith's friend, Gerald Allen Thomas, and drank beer with Smith and played pool with him. The three men left Thelma's Tavern in a blue Ford station wagon driven by defendant. Smith was drunk and was refused drinks at a few bars. Defendant did not appear intoxicated although he was seen drinking beer. When the last bar was closing at 2 a.m., Thomas found that defendant and Smith had left without him while he was playing pool. He had last seen them together at 1:20 a.m.

"Defendant was next seen at 4:30 a.m. on the 26th when he rented a room at the Wagon Wheel Motel. He arrived without a car and told the manager that his car had broken down on the freeway. He did not appear drunk although he looked tired and dirty. He gave a fictitious name and left at 9:30 a.m.

"An engineer on a passing train saw Smith's body on the railroad right-of-way near Myers Street in Arlington at 2 a.m. that morning. Police officers arrived about 2:30 a.m. and found that Smith had been shot six times. They found a .22 caliber shell casing near the body and footprints around it and in the vicinity. There was no money in Smith's wallet, although he had approximately $75 in cash the previous morning. A few streets away the officers found a blue Ford station wagon abandoned in a ditch, and in the station wagon they found expended and live shells and a license plate. They removed fingerprints from the car and placed them on cards.

"About 11:45 a.m. on February 26, 1966, a police officer, who had been given a description of defendant as a murder suspect, saw him on the street. He stopped defendant and asked if he had any identification. Defendant

produced a receipt for rent paid by Paul L. Moslands. The officer searched defendant and found a .22 caliber revolver and live ammunition and approximately $75 in cash. The officer told defendant that he was being arrested on suspicion of murder.

"Defendant's footprints fit those near Smith's body, and his fingerprints were identical with those taken from the station wagon. The bullets that killed Smith were fired from the gun taken from defendant.

"Police officers searched defendant's room at the Wagon Wheel Motel and found keys that fit the station wagon and also keys that fit a pickup truck owned by Smith."

At the second penalty trial, the prosecution also introduced evidence to show that in the week preceding the night of the murder defendant committed a series of crimes in the Riverside area, including at least five burglaries, an armed robbery, a car theft, and a forgery. In addition, it was established that defendant had suffered prior convictions of forgery, receiving stolen property, and escape.

Defendant did not take the witness stand. Various lay witnesses testified in his behalf that he had been a neglected and nervous child, raised in unsettled family conditions with two stepfathers who drank excessively. A defense psychiatrist, Dr. Keith S. Ditman, testified that in his opinion defendant was a severe neurotic with mild to moderate paranoia, suffering from hereditary personality disorders and chronic alcoholism. Dr. Ditman was of the view that defendant's capacity for deliberation, judgment, and self-control was diminished at all times, and particularly so when he was under the influence of alcohol. In reaching the latter conclusion the witness relied heavily on an electroencephalographic examination that had been administered to defendant by another doctor. In Dr. Ditman's opinion, the tracings of that electroencephalogram were normal until defendant, who was given beer during the examination, reached a certain level of inebrity, at which point a psychomotor epileptic seizure took place. On cross-examination Dr. Ditman acknowledged that his premise—i.e., that defendant was drunk at the time of the crimes—was based solely on the story told to him by defendant, who was by nature unreliable. The witness also conceded that "alcoholic blackouts" and amnesia can be successfully faked, although he insisted that defendant had not done so. Finally, Dr. Ditman acknowledged that defendant had previously told different versions of the events to other psychiatrists; that it is "not possible" to say "how much of [defendant's story] is fabricated and how much is true"; and that defendant has an IQ of 110, characterized as "bright normal."

Expert witnesses testified in rebuttal. Dr. O. L. Gericke, a psychiatrist and Superintendent of Patton State Hospital, gave as his opinion that

defendant had the capacity to conceive, deliberate, and plan the robbery-murder of Smith. The witness found no evidence of diminished capacity, and his conclusions were consistent with those of a prison psychiatric report which had diagnosed defendant as a sociopath with a basic aggressive personality pattern.

Dr. George N. Thompson, a psychiatrist specializing in the fields of neurology and electroencephalography, examined the tracings on which Dr. Ditman had relied. He concluded that the apparent irregularities emphasized by the latter were not evidence of abnormal brain activity but merely "artifacts," i.e., extranecus events which occur in the course of every electroencephalographic examination and produce artificial distortion of the tracings. Dr. Thompson explained that such artifacts can be caused, for example, by any muscular contraction of the patient, by any movement or jarring in the examining room, by the accidental loosening or disconnection of an electrode, or by sweat on the patient's skin underneath an electrode. He then identified the irregularities in defendant's electroencephalogram as caused by movements of the patient and by loose electrodes, following such events as swallowing, vomiting, and other muscular contractions.

After the jury panel was agreed upon and sworn, and during the *voir dire* of alternate jurors, a venireman asked "Whether a parole is part of the life sentence." In order to answer the question properly, the court proposed to read CALJIC No. 306.2 (New), taken verbatim from our decision in *People* v. *Morse* (1964) 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], which admonishes the jury not to consider the possibility of parole in determining the punishment to be imposed. The instruction was first submitted to defendant for his perusal, and counsel for both sides stated they had no objection and entered into a stipulation that it could be read to the panel at that time. The court then read the instruction, explaining to the jury that it was only one of the various instructions which would ultimately be given and that it would itself be given again at the appropriate time. After it was read, the venireman indicated he would have difficulty following it, and was excused upon stipulation of both counsel.

Under the circumstances there was no error in reading the *Morse* instruction at the *voir dire* stage of the trial. Penal Code section 1093, subdivision 6, provides in relevant part that "At the beginning of the trial or from time to time during the trial, and without any request from either party, the trial judge may give the jury such instructions on the law applicable to the case as he may deem necessary for their guidance on hearing the case." Commenting on this statute, it has been pointed out that "Calling the attention of the jury at the commencement of the trial, to legal problems to be met, if fairly done, may be of great value in enabling the jury to

understand the purpose and thus properly evaluate various bits. of the evidence. The law authorizes it." (*People* v. *Jones* (1960) 184 Cal.App.2d 464, 473 [7 Cal.Rptr. 424].) Here the venireman under consideration revealed precisely the kind of misunderstanding the *Morse* instruction was designed to forestall. Since the issue had thus been raised in the presence of the whole panel, the court was well advised to settle it as promptly as possible by giving the instruction at that time, while explaining that the jury would subsequently be instructed on all the issues of the case. In any event, defendant stipulated to the reading of the instruction and may not now be heard to complain of its timing.

Nor are we persuaded by defendant's request that we reconsider the content of the instruction proposed in *Morse,* urging that the jury should be told merely that "life imprisonment means life imprisonment. . . ." In *Morse* (60 Cal.2d at p. 647) we recognized as a practical matter that "individual jurors often entertain some ideas of parole laws and might erroneously consider the effect of such laws upon a term of life imprisonment"; we reasoned that such jurors—as indeed was the case here—"may ask the trial judge for information upon the subject; it is not enough for the trial court merely to refuse the request and relegate them to ignorance"; and we concluded that it is better to "avoid such unanswered queries and to prevent latent misconceptions" by acknowledging the possibility of parole but forbidding the jury to consider it. We have no cause to believe that the solution adopted in *Morse* has been ineffective, and we therefore adhere to that rule. Indeed, the *Morse* instruction is ordinarily mandatory in capital cases. (*People* v. *Varnum* (1969) 70 Cal.2d 480, 490 [75 Cal.Rptr. 161, 450 P.2d 553].)

Among his witnesses defendant called Capt. Joseph S. Lowrey of the Riverside sheriff's office, who was in charge of the jail in which defendant was awaiting his retrial. The witness testified that on the night of January 7-8, 1968, seven inmates of the jail escaped by sawing their way through a barred window; although defendant had an opportunity to join the escape, he did not do so. To rebut the favorable inference from this testimony the prosecution called John Hopkins, who had been a fellow inmate with defendant during this period. The witness testified that shortly after his arrival at the jail in October 1967 he was told that defendant and another inmate had planned an escape and were waiting delivery into the jail of hacksaw blades and guns. When the delivery failed to materialize, the attempt was postponed but the subject of an escape was continuously discussed by the inmates, including defendant, until the successful breakout in January 1968. In that affair defendant took his turn cutting the bars with

saw blades that had been smuggled into jail. After Hopkins was apprehended and returned to custody, he asked defendant why he had not joined the escape. The latter replied that "after he thought it over" he decided that "if he didn't go it would look good . . . at his trial." Deputy Sheriff Ronald Williams then testified that following the escape he searched the cells and found four hacksaw blades carefully secreted under defendant's bunk.

The foregoing evidence was the subject of comment in the arguments to the jury. Citing *People* v. *White* (1968) 69 Cal.2d 751, 761-762 [72 Cal. Rptr. 873, 446 P.2d 993], defendant contends that the prosecutor's argument in this respect erroneously invited the jury to speculate on the possibility that defendant might escape from prison in the future.[1] As will appear, the record is otherwise, and shows neither error nor misconduct.

In *White* the prosecution introduced evidence at the penalty trial that the defendant attempted to escape from custody on the day of arraignment. The purpose of this evidence we observed, was to show the defendant's lack of remorse and the poor prospect of his rehabilitation. We recognized that the evidence was properly received, but concluded that certain comments thereon in the prosecutor's argument to the jury erroneously diverted them from their duty and responsibility in violation of the principle of *Morse.*[2]

---

[1]"I fail to see that Mr. Bandhauer is not in fact—in fact told you ladies and gentlemen, by his actions over a period of years that the proper penalty in this particular case is the death penalty. He showed when he escaped from incarceration—he shows and plans escape, and in planning the escape plans for guns to come in—these guns he is familiar with using. We know that. He can be a danger, and in the course of a burglary or armed robbery and in the course of, of course, a situation such as occurred to Mr. Smith.

"Ladies and gentlemen, I ask you from the evidence you have had brought before you—all the testimony you have heard, the exhibits you will be able to look at—considering—consider very carefully—in my opinion, from the evidence we have here before us, we have a man who cares nothing about anybody else's property nor life, nor the danger he brings to anybody else, and he has indicated this to us time and time again.

"Ladies and gentlemen, from the evidence we have there is more than ample, in my opinion, and I ask you to bring in the verdict of the ultimate penalty—death for Mr. Bandhauer. Thank you very much, ladies and gentlemen."

[2]The comments found objectionable in *White* were quoted as follows in our opinion (69 Cal.2d at p. 762, fn. 4):

"The prosecuting attorney argued, 'if you think that Mr. White is remorseful—why, sure he is, folks, that is why he tried to escape from the County Jail and get out of this state. That is why. He has demonstrated that he will take the first opportunity that is available to him and he will try to get out of custody. He will not take his medicine. He will not take punishment. He will do anything he can to avoid it.

" 'And, ladies and gentlemen, what would he be like after an escape? More destitute, more desperate than he was at these times.' "

"Defense counsel promptly objected and the trial judge admonished the jury to disregard the last comment."

In the present case, by contrast, the thrust of the prosecutor's argument was not that defendant will escape in the future but that in the past he has had the mental capacity to *plan* an escape and then decide for tactical reasons not to consummate it. When the remarks selected by defendant (*ante,* fn. 1) are viewed, as they must be, in the context of the entire argument, it clearly appears the prosecutor was referring to the escape incident primarily to rebut Dr. Ditman's testimony that defendant lacked the capacity to plan and deliberate.[3] It is not error, of course, to argue reasonable inferences from evidence presented to the jury. (*People* v. *Ketchel* (1963) 59 Cal.2d 503, 541 [30 Cal.Rptr. 538, 381 P.2d 394], and cases cited.) Moreover, in the paragraph immediately following that containing the allegedly improper reference, the prosecutor reminded the jury of their duty to consider carefully "the evidence you have had brought before you— all the testimony you have heard, the exhibits you will be able to look at" (*ante,* fn. 1). Finally, in further distinction to *White,* defendant failed to assign the remarks in question as misconduct and request an admonition to the jury. Any harm resulting from these remarks was not incurable (compare *People* v. *Modesto* (1967) 66 Cal.2d 695, 716-717 [59 Cal. Rptr. 124, 427 P.2d 788], with *People* v. *Bandhauer* (1967) *supra,* 66 Cal.2d 524, 529-530), and hence may not be complained of for the first time on appeal.

Defendant contends there is "no indication" that the trial court reweighed the evidence before ruling on his motion for reduction of the penalty. The

---

[3]Thus in the portion of the argument immediately preceding the passage quoted by defendant, the prosecutor stressed the evidence of defendant's "plotting and planning" the escape, and then rhetorically asked why defendant decided not to join the escapees. The prosecutor continued:

"Mr. Bandhauer had escaped once. You recall that. He was caught. Mr. Bandhauer telling Mr. Hopkins when Mr. Hopkins is back in jail after he is recaptured and again incarcerated in the County Jail, telling him, 'I didn't escape because it looked better for my trial.'

"*Ladies and gentlemen, Mr. Bandhauer is the one who is thinking these thoughts,* relating these thoughts to Mr. Hopkins, and he didn't escape because he had been captured once before. He knows he is going to be captured again. They don't get away too long. We are all aware of that from our own observation—newspapers and what not. He had suffered that as a result of one escape. He knows he has a trial coming up and the fact that he doesn't escape, *he tries to use for his benefit.* 'I didn't escape, and therefore, ladies and gentlemen, properly I should be just kept in prison.'

"*Ladies and gentlemen: He is a cunning individual.* Doctor Ditman tells us his intelligence I.Q. is bright to normal. We have testimony of all the activities he has been involved in—the type of individual he has been all his juvenile and adult life. This individual, Mr. Bandhauer, is the one who did the killing, the shooting of Mr. Smith and the method of shooting, and the closeness, the proximity of that gun to the clothing, to the shirt, the pants—the six shots—*fail to escape because he told Mr. Hopkins that this would look better, look good for his trial—who can plan things and control his destiny.* He is a planner and he controlled his destiny. He took the life of Mr. Walter Ashley Smith *just as he didn't escape.*

"*He plans, contrives what he has done.* He has throughout his life." (Italics added.)

facts do not support this assertion. Our review of the evidence bearing on the issue of diminished capacity shows it to be in substantial conflict; the jury were fully instructed on the issue, and must be deemed to have resolved the conflict in favor of the prosecution.[4] Nevertheless, defendant was entitled to ask the trial court to reweigh that evidence and redetermine its probative force. (*People* v. *Love* (1961) 55 Cal.2d 720, 728 [16 Cal. Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].) He so moved, and filed a memorandum of points and authorities supporting the motion on two grounds: i.e., that the jury selection process violated the mandate of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and that the evidence established the fact of defendant's diminished capacity, citing our principal decisions on that defense.[5] On June 13, 1968, the matter came on for hearing, and defense counsel argued at length the weight of the diminished capacity evidence *and reminded the court of its duty under the Love rule.* The court then advised counsel that "I want to try to digest the Witherspoon opinion and the remarks made by counsel here," and asked for a week's continuance to do so. It was so agreed, and on June 21 the matter was called again. At that time the court stated, "I have considered the memorandum which has been submitted and have to the best of my ability studied the case of Witherspoon versus State of Illinois," and inquired whether there was to be further argument. Counsel for defendant replied, "No, Your Honor, as the Court has read over the various factual matters and was present during the course of the trial." The court then denied the motions for reduction of the penalty and for new trial. It is apparent from the foregoing record that the trial court both knew and performed its duty to reweigh the evidence on this motion, and that defendant's trial counsel was satisfied in this regard.

■ Nor is there merit in defendant's claim that the exclusion of venireman Wayne R. Johnson by reason of his views on capital punishment constituted prejudicial error under *Witherspoon.* At the time of the ruling the regular panel of 12 jurors had been chosen, and Mr. Johnson was under

---

[4]On the question whether defendant was so intoxicated at the time of the crime as to entitle him to a voluntary manslaughter instruction on the theory of diminished capacity, we ruled in our prior opinion that "Although Smith was refused drinks during the evening because of his apparent intoxication, defendant was not. He was not seen to have had more than six or seven beers during the six hours he was at various bars between 8 p.m. and 2 a.m., and he did not appear to be intoxicated. There is no evidence that his drinking had any substantial effect on him, or that he was so intoxicated that he did not or could not harbor malice. There is thus no substantial evidence of diminished capacity to support a voluntary manslaughter instruction on that theory." (66 Cal.2d at p. 528.)

[5]*People* v. *Nicolaus* (1967) 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Goedecke* (1967) 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777]; *People* v. *Wolff* (1964) 61 Cal.2d 729 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492].

consideration solely as an alternate juror. As matters turned out, no alternate juror was called upon to participate in the deliberations of the jury. It is manifest that any error in excluding Mr. Johnson on this ground was therefore harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

In cross-examining Dr. Ditman the prosecutor asked whether the name "Modesto," which appeared in the doctor's notes of his interview with defendant, had any significance to him. The witness replied he though it referred to a city. The prosecutor continued, "Supposing, sir, I told you that this is the name of a prisoner," and "assuming, sir, after informing you that this is the name of an individual who used exactly the same type of defense before. . . ." At this point defense counsel objected on the ground that the inquiry assumed facts not in evidence. After a discussion at the bench, the prosecutor dropped the matter. Defendant now contends the court should have instructed the jury on its own motion to disregard the prosecutor's remarks. No such instruction was required. The incident was trivial, and there is no showing the jury understood the name "Modesto" to mean anything more than the witness understood it to mean. Moreover, in view of the doctor's stated position that defendant was not "knowledge-able" enough to have fabricated his symptoms of alcoholic blackout and amnesia, it was a proper subject of cross-examination to inquire whether the doctor was aware that during the period of one year and ten months between the arrest and the medical examination by this witness, defendant had talked to other "knowledgeable" prisoners about his case. Such an inquiry would assist the jury in appraising the basis of the doctor's expert testimony. (Evid. Code, § 802.)

■ The court instructed the jury that it must "apply the law of the case . . . regardless of what the consequences of such a verdict might be," and that "The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." We have repeatedly held that it is error to instruct the jury at a penalty trial not to consider sympathy for the defendant in reaching its verdict. (*People* v. *Polk* (1965) 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641]; *People* v. *Anderson* (1966) 64 Cal.2d 633, 641-642 [51 Cal.Rptr. 238, 414 P.2d 366]; *People* v. *Friend* (1957) 47 Cal.2d 749, 767-768 [306 P.2d 463].) Moreover, that error is not cured by also instructing the jury that "you are entirely free to act according to your own judgment, conscience and absolute discretion." As we pointed out in *People* v. *Vaughn* (1969) 71 Cal.2d 406, 422 [78 Cal.Rptr. 186, 455 P.2d 122], the jury might resolve the inconsistency between the two instructions "by

concluding that the restriction on sympathy served as an exception to their otherwise unlimited discretion." Thus, jurors who may have felt sympathy for defendant because of the evidence of his tragic childhood might also have felt compelled as "the law of the case" to disregard such sympathy even though the consequence was to impose a death penalty that they otherwise would have deemed unwarranted.

It is contended, however, that because the instruction to disregard sympathy was followed by instructions on other crimes as such crimes might bear on the issue of penalty, the jury understood the erroneous instruction to apply only to proof of other crimes. There is no merit in this contention. The language of the instruction was in no way limited to the jury's consideration of proof of other crimes, and that language obviously applied to the jury's decision of the issue of penalty, the only issue the jury had to resolve in its verdict. Moreover, we believe that it would be needlessly confusing to instruct the jury at the trial on the issue of penalty that it must not consider sympathy in determining whether the defendant committed other crimes, evidence of which is offered in aggravation of penalty, but may consider sympathy in fixing the penalty for the crime for which he is on trial. Cases may arise in which the circumstances surrounding a prior crime might engender sympathy for the defendant, and, in such cases, if the jury were instructed that it must not consider sympathy in determining whether the defendant committed a prior crime, it might feel compelled to disregard such sympathy engendering circumstances in determining the penalty. The risk of such confusion outweighs any possible detriment the prosecution might suffer from the jury's not being instructed to disregard sympathy in determining whether a prior crime had been proved beyond a reasonable doubt.

In the present case the error in instructing the jury not to be governed by "sentiment . . . [or] sympathy" was not only a substantial error, but it was aggravated when all of the instructions were reread at the jury's request. Accordingly, the judgment on the issue of penalty must be reversed. (*People* v. *White* (1968) 69 Cal.2d 751, 763 [72 Cal.Rptr. 873, 446 P.2d 993]; *People* v. *Hines* (1964) 61 Cal.2d 164, 168-170 [37 Cal. Rptr. 622, 390 P.2d 398]; *People* v. *Hamilton* (1963) 60 Cal.2d 105, 136-137 [32 Cal.Rptr. 4, 383 P.2d 412].)

The judgment is reversed insofar as it relates to penalty. In all other respects the judgment is affirmed.

**MOSK, J.**—I dissent.

Realistically viewed, the instruction forbidding the jury to be governed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opin-

ion or public feeling" is, on balance, favorable to the defendant. Of the various influences proscribed, "sentiment" is vague and "conjecture" is neutral, but "passion, prejudice, public opinion or public feeling" are most often hostile to the defendant. I doubt, for example, that the majority would sanction an instruction which affirmatively authorized the jury to be governed by such "passion, prejudice, public opinion or public feeling." This leaves "sympathy" as the majority's main concern. But even that emotion, I submit is more likely to be evoked in favor of the innocent victim and his family than of the criminal whom the jury has convicted of the offense.

This court has nevertheless condemned the use of the quoted instruction in penalty trials (*People* v. *Stanworth* (1969) 71 Cal.2d 820, 842 [80 Cal.Rptr. 49, 457 P.2d 889]; *People* v. *Vaughn* (1969) 71 Cal.2d 406, 422 [78 Cal.Rptr. 186, 455 P.2d 122], and cases cited), although we have not hitherto held the error prejudicial. In the case at bar, however a significant additional element is present. Here the prosecution introduced a substantial body of evidence tending to prove various other crimes committed by defendant, and the jury were therefore called upon to decide issues of guilt as well as penalty—i.e., whether defendant was guilty of each of the other crimes in question. On an issue of guilt, we have recognized, the challenged instruction is proper. (*People* v. *Polk* (1965) 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641].) It follows that the trial court's only failing in this regard was in not limiting the jury's application of this instruction to their deliberations on defendant's guilt of the other crimes.[1] I do not share the majority's lack of confidence in the ability of our trial courts to explain, and the juries to understand, such a limitation. Indeed, our juries are daily called upon to perform far more difficult mental tasks, such as limiting their consideration of a prior inconsistent statement of a witness to its impeachment value alone. (See *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111].)

On the record before us, I cannot find that the omission of a limiting instruction constitutes "substantial error" requiring reversal under the rule of *People* v. *Hines* (1964) 61 Cal.2d 164, 169 [37 Cal.Rptr. 622, 390 P.2d 398]. This was not an ordinary penalty trial, at which only the *Morse* instruction and one or two others were given. Here the challenged language was part of a lengthy opening instruction on the duties of the jurors. (See CALJIC No. 1 et seq.) It was followed by six further instruc-

---

[1]Although the defendants' guilt of other crimes was also at issue in the *Polk* penalty trial, it was necessary to reverse the judgment on separate grounds and we did not draw the conclusion just stated.

tions on general matters, by no less than 21 instructions defining the elements of the various other crimes, and by six instructions defining murder, malice, deliberation and premeditation, and the effect of evidence of intoxication. Then and only then were the jury instructed on their powers and responsibilities in fixing the penalty. The latter instruction (CALJIC No. 306.1 (New)) correctly informed the jury that "Beyond prescribing the two alternative penalties, the law itself provides no standard for the guidance of the jury in the selection of the penalty, but, rather, commits the whole matter of determining which of the two penalties shall be fixed to the judgment, conscience and *absolute discretion* of the jury," and that "Notwithstanding facts, if any, proved in mitigation or aggravation, in determining which punishment shall be inflicted, *you are entirely free* to act according to your own judgment, conscience and absolute discretion." (Italics added.) It is true that in *People* v. *Vaughn* (1969) *supra,* 71 Cal.2d 406, 422, we declined to accept the argument that the latter instruction, without more, cures the error. But the instructions must always be viewed as a whole, and on the present record the jury could not reasonably have believed that this clear and forceful declaration of their discretion in the choice of penalty was limited or qualified in any way by some general introductory remarks spoken 33 instructions earlier.

Two separate juries have heard the evidence and called for the extreme penalty in this case. We reversed before (66 Cal.2d 524) because of asserted prejudicial misconduct of the prosecutor. Now the majority seize upon one word in one instruction to reverse as to penalty a second time. The result is a heavy burden upon the expeditious administration of criminal justice. I am persuaded there is wholly inadequate justification under the "miscarriage of justice" clause of the Constitution (Cal. Const., art. VI, § 13) to require yet another penalty trial.

I would affirm the judgment.

McComb, J., and Burke, J., concurred.

Respondent's petition for a rehearing was denied February 18, 1970. McComb, J., was of the opinion that the petition should be granted.