Filed 7/8/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>HENRY MORGAN,<br><br>    Defendant and Appellant. | A166435<br><br>(Sonoma County<br>Super. Ct. No. SCR7469261) |

Having ignored officers' orders to get down on the ground, defendant reached into his car, pulled a gun from the front seat, took a "shooting stance," "racked" his gun, took aim directly at the head of an officer trying to subdue him so that the officer was "staring down the barrel of the gun" and certain he was about to die, pulled the trigger, and then fled in his car with the officers in hot pursuit. The issue before us is whether the jury could convict defendant of "resisting" the officers by "the use of force or violence" (Pen. Code, § 69, subd. (a))[1] because it turned out defendant's gun was unloaded.

Defendant maintains the resisting charges never should have been submitted to the jury because precedent holds assault cannot be committed with an unloaded firearm and assault is a necessarily included lesser offense

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

of resisting an officer under section 69, subdivision (a).  Since his gun was unloaded, defendant could not have been convicted of assaulting the officers.  Ergo, says defendant, he could not have been convicted of the greater offense of resisting an officer by the use of force or violence.

The Attorney General does not take issue with the venerable case law holding assault cannot be committed with an unloaded firearm.  He does not agree, however, that it was beyond the province of the jury to find that defendant engaged in violent conduct while resisting the officers' efforts to subdue and arrest him.

We have no doubt that in most cases a defendant who, by use of force or violence, resists an officer in the performance of his or her duties will also commit assault.  However, the circumstances in this case are unlike those in any other section 69, subdivision (a) case cited by the parties or which we have located through our own research.  On due consideration, we agree with the Attorney General that the frightening and dangerous scenario that unfolded here—which indisputably impeded the officers as they tried to perform their lawful duties and put not only defendant, but also bystanders, at serious risk of injury or death from the officers' own use of deadly force to prevent what appeared to be their own imminent peril—comes within the bounds of the language and purpose of section 69, subdivision (a).  We therefore affirm defendant's conviction.  We further conclude, however, the trial court erred in sentencing defendant and remand for resentencing in accordance with section 1170 as recently amended by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3, eff. Jan. 1, 2022).

BACKGROUND

*The Encounter Between Defendant and Officers*

California Highway Patrol Officer Matthew Goulding was driving eastbound in Sonoma County when he spotted "two men in [a] dirt field" that was part of, or on the outskirts of, a county park. The two men were "facing each other." One (who was later identified as defendant) had a knife and the other, a rock, and they "appeared to be in a stand-off, more or less a confrontation with each other."

Goulding pulled to a stop in the middle of the eastbound lane, at a diagonal, to "get traffic to stop coming towards [him] because [he] didn't want anybody else near [him] when this dangerous encounter was going on." Goulding had on his "[f]ull tan uniform with [his] CHP badge and [his] name tag and gun belt and all [his] tools," and his patrol car was a "fully marked black and white CHP patrol vehicle."

Goulding could see that defendant was holding the knife "with a closed fist . . . with the blade pointed upward." He was in "an athletic combative stance . . . [c]learly an aggressive stance engaging with . . . the other individual." Goulding, who was approximately eight to 10 feet away from the men, got out of his vehicle, drew his side arm, and raised it "in an attempt to de-escalate both of their actions" and "de-escalate the whole situation."

Neither man realized Goulding was there until he "started shouting commands." Goulding told them to "drop their respective weapons and to get down on the ground." The man holding the rock immediately complied. Defendant was "slow to react," but did "eventually lay down," although he continued to hold the knife. Goulding ordered defendant to "throw the knife away" from himself and "he did so."

3

Goulding thereupon holstered his weapon and called for his "beat partner," who was working the same area, so Goulding could "secure the scene," detain both men, and investigate what had happened.

Defendant, who was still on the ground, "started screaming," " 'I just want to leave, I just want to leave, I just want to leave.' " He then suddenly "stood up, raised his hands above his head and started walking towards" Goulding. Fearing defendant might attack him, Goulding drew his taser.

Undeterred, defendant kept advancing toward Goulding, repeating that "he wanted to leave." At that point, Goulding decided not to "taze" defendant because he "believed . . . all [defendant] wanted to do was to leave." Goulding repeatedly told defendant "to get down on the ground." Defendant continued to ignore the officer and continued walking, and Goulding eventually realized he was walking toward a red Subaru parked on the shoulder of the road. Goulding noted the Subaru's license plate as defendant got into the car and drove off, heading eastbound. Goulding asked dispatch to run the plate number and requested responding units to try to locate and stop the car.

As Goulding turned his attention to the other individual, Sonoma County Park Ranger Stephen Peake arrived on the scene offering his assistance. Seeing Peake was unarmed, Goulding decided not to "directly involve him" but asked him to run a vehicle search on a recreational vehicle that was also parked at the scene.

Shortly after defendant drove away, Goulding saw him return to the scene. Fearing for his safety, Goulding moved toward his patrol vehicle and opened the driver's side door as a shield. He drew his "side arm and prepare[d] to engage in possibly a gun battle with [defendant] based off everything [he was] seeing at [that] point."

4

Defendant appeared to be "[h]ysterical" and was yelling, but Goulding could not make out what he was saying. As defendant stood "in the V of [the Subaru's] door" (the "area when you open your driver door and you step out"), he "leaned over inside the vehicle and started rummaging around like he was looking for something." When he reemerged, defendant was holding a "black pistol in his right hand."

Around this time, Sonoma County Deputy Sheriff Micah Hope arrived and saw Goulding in a "high-risk stop with his gun pointed" at defendant. Goulding warned Hope that defendant had a gun.

As defendant moved toward the rear of the Subaru, both Goulding and Hope began "screaming 'drop the gun, drop the gun.'" Instead of doing so, defendant "raise[d] the gun and point[ed] it" at Goulding. Defendant was in a "shooting stance" and had the gun aimed squarely at Goulding's head. Goulding was looking "down the barrel of [defendant's] gun" and was "most definitely in fear for [his] life." Although Goulding could not tell whether defendant was trying to pull the trigger, Hope heard a "click" which he believed emanated from defendant's pulling the trigger. Goulding continued to "yell at [defendant] 'drop the gun, drop the gun.'" Defendant continued to ignore him and began making "erratic movements like he was distraught" and "just extremely upset."

Both Goulding and Hope saw defendant "rack" the gun. It appeared to Goulding that defendant was trying to "load[] a bullet into the chamber." According to Hope, "you would do that . . . if the gun was jammed and not functioning correctly[,] you would rack the slide to get it back to working order." After defendant racked "the slide probably three times," Hope "saw him pull the trigger of the firearm while it was pointed at the ground. Since nothing happened and [Hope] could kind of hear a metallic click [i]t indicated

to [him] that the gun was either out [of ammunition] or it was perhaps a very realistic fake, like an airsoft gun."

Hope nevertheless was in "fear[] for [his] life and [he] could have absolutely articulated [*sic*] shooting [defendant]." He testified, "[I]t is certainly the closest I've ever come in my 14-year career to shooting somebody." But he had "just a little sliver of doubt" that defendant was going to fire a fatal shot given "the lack of [defendant's] gun directly pointing at [him] or another officer."

Similarly, from the "moment [defendant] drew his weapon and pointed it directly at" him, Goulding "believed that all [defendant] had to do was pull a trigger and it would be operable." But as minutes passed and defendant "continued to try and manipulate the weapon, racking the slide, trying to load a round from the magazine into the chamber," Goulding began to "question[] the gun's operability." Regardless, Goulding "knew it wasn't safe" and "perceived [defendant] was a threat the entire time." He thought defendant "was trying to get the gun to function properly, that he was trying to fire on us."

Defendant continued to move, this time toward the back of Peake's pickup truck. He was "walking quickly still with the gun, still kind of waving it around, cursing, clearly very angry." Both Goulding and Hope continued to order him to "drop the gun."

Peake, who had taken cover behind the engine compartment of his truck, had watched events unfold and saw Goulding draw his weapon and order defendant to drop his. Defendant ignored the commands. Peake stayed down "expecting gunshots," and then heard footsteps behind him. As he turned, still crouched behind his truck, Peake saw defendant round the truck with his gun in hand. Peake ran, and as he did so, "heard a click, which [he]

6

interpreted to be a trigger pull." Peake "thought [he] was dead or that [he] was going to die" and was "hoping maybe [his] vest would take the bullet." He stayed crouched as he ran, keeping his head low, toward Goulding and took cover behind Goulding's vehicle.

As defendant started to move toward a bus stop, another deputy arrived. With three officers ordering him to drop his gun, defendant moved back toward the Subaru, still holding the gun. Defendant got in his car, drove around Goulding's patrol car, and headed westbound. Within moments, defendant stopped and got out "with the pistol in his hand kind of waving it down next to the ground or next to his waist," "screaming and yelling." Defendant then got back into his car and continued driving westbound.

Several officers, including Goulding and Hope, gave chase. Goulding activated the lights and sirens of his patrol car.

Defendant soon turned into a dead-end street, parked at the end, got out, and ran in a northerly direction. The officers pulled in behind his car and chased him across a field to a house, which defendant ran behind. Unsure if defendant still had his gun, the officers split into two groups in hopes of coming at defendant from two directions. With weapons drawn, the officers found defendant "kind of hiding" and ordered him to get down on the ground. Goulding did not see a gun on defendant's person, and after defendant briefly "physically resist[ed]," Goulding was able to gain control and place him under arrest.

Deputy Sheriff Aaron Hunt reported to the scene of the arrest and asked defendant where the gun was. Defendant told him it was in his car. He also asked Hunt "several times why didn't they shoot [him]." Deputy Sheriff David Higgenbottom then searched the Subaru and found a "gray and

7

black handgun sitting on top of some clothes covered by other clothes" on the front passenger seat of the car. He did not test the usability or functionality of the gun.

According to defendant, on the day of the incident he "was just, like, smoked out of [his] mind." He said, "[I] was just really mad. I really thought that people were chasing me, following me, and I believed that, like, I was talking to people through telepathy, even though I wasn't, you know? But I believed that people were talking to me in my head and I was talking to people in their head." He admitted he had earlier driven to a compost company where he had worked, driven in circles around the parking lot, and gotten out of his car and stabbed, and ruined, the tires of one of the company tractors. He then drove to the park, where he parked near a recreational vehicle and began throwing pennies at the vehicle. The individual inside got out, ran over to where defendant was sitting in his car, and sprayed him with pepper spray. Defendant, armed with a knife, got out of his car to confront him. At this point, Officer Goulding happened upon them.

Goulding told the two to "get down on the ground." Defendant did so, but then got up to go to his car to "avoid" any "type of cop interaction" since officers "always seem to just harass [him], search [him]." Defendant retrieved his gun because he "got tired of being chased, harassed, bothered," and so he "could get suicide by cop." When he returned to the scene, he "was really scared, but [he] just knew that [he] had to hurry up and point the gun at them so [he] could just get killed really fast, you know, with as little as— pain as possible." So he grabbed the gun out of his car, pointed it at them in a way he "knew that [he] could get assassinated," "cocked it back," and pulled the trigger so that Officer Goulding would shoot him. He "only remember[s]

8

pointing it at Goulding." He admittedly "cocked [the gun] back twice" and pulled the trigger an equal amount of times.

When it appeared the officers were not going to kill him, he "put the gun inside [his] vehicle." At that point, he "believed that they were civilians impersonating officers." He heard people yelling but did not understand what they were saying, nor did he recognize them as police officers. After looking for his keys, he "proceeded to get inside [his] vehicle again, and [he] just—[he] thought [he] was scot-free." When he got to the dead-end street—where officers surrounded him—he "was having second thoughts. [He] was thinking that perhaps [he] did really just mess up and [he] just did something that's going to probably bring repercussions," so he "just took off." When officers eventually handcuffed him, he asked, "why didn't they shoot me. You know, because I feel, like any other cop, they would have shot and killed me. One hundred percent sure. And I felt the lack of them not doing that gave me the impression that they weren't cops to begin with."

Defendant was never asked by the prosecution or the defense, nor did he ever voluntarily testify, whether his gun was loaded or unloaded or whether he thought it was loaded or unloaded.

***The Charges and Convictions***

The operative third amended information charged defendant with three counts of felony resisting an officer (§ 69, subd. (a)—counts 1, 3 & 4), misdemeanor exhibiting a concealable firearm in the presence of a peace officer (§ 417, subd. (a)(2)(A)—count 2), possession of a firearm by a felon, a felony (§ 29800, subd. (a)(1)—count 5), felony exhibiting a firearm in the presence of a peace officer (§ 417, subd. (c)—count 6), misdemeanor resisting a peace officer (§ 148, subd. (a)(1)—count 7), felony vandalism (§ 594, subd. (a)—count 8), felony making criminal threats (§ 422, subd. (a)—

9

count 9), and misdemeanor fleeing a peace officer (Veh. Code, § 2800.1, subd. (a)—count 10). As to counts 1, 3 and 4, it was further alleged defendant personally used a firearm (§ 12022.5).

The jury found defendant guilty of count 1 (resisting by force or violence Officer Goulding—§ 69) and found true the related firearm enhancement (§ 12022.5, subd. (a)); count 5 (possessing a firearm by a felon—§ 29800, subd. (a)(1)); count 6 (exhibiting a firearm, whether loaded or unloaded, in a rude angry, or threatening manner—§ 417, subd. (c)); count 7 (willfully and unlawfully resisting Deputies Andrews and Hope, Officer Goulding, and Ranger Peake—§ 148, subd. (a)(1)),[2] and count 8 (vandalism—§ 594, subd. (a)).

The jury deadlocked on counts 3 and 4 (resisting by use of force or violence Officers Andrews and Hope—§ 69) and count 10 (evading a peace officer—Veh. Code, § 2800.1, subd. (a)). The jury found defendant not guilty of count 2 (exhibiting a firearm in a threatening manner by pointing an unloaded firearm at Park Ranger Peake—§ 417, subd. (a)(2)(A)) and count 9 (making a criminal threat against Officer Higgenbottom—§ 422).[3]

Defendant additionally admitted to a 2012 conviction "of battery on a peace officer who was engaged in the performance of their duties," a 2013

---

[2] As we shall discuss, section 148, subdivision (a)(1) is a necessarily included lesser offense of resisting an officer by "the use of force or violence" under section 69, subdivision (a). (*People v. Smith* (2013) 57 Cal.4th 232, 242–243 (*Smith*).)

[3] The May 25, 2022, court minute order indicates the jury was deadlocked on counts 3, 4, 6, and 10. However, the jury verdict form, the reporter's transcript, and the abstract of judgment all indicate the jury reached a guilty verdict on count 6 (exhibiting a firearm in the presence of a peace officer). The minute order, thus, appears to be inaccurate, and we will order the matter remanded to allow for correction of the order.

conviction for petty theft, two 2015 convictions for felony domestic violence, and a 2020 conviction for misdemeanor resisting arrest. He also admitted a pending battery charge.

The trial court sentenced defendant to seven years and four months.

## DISCUSSION

### *Motion for Acquittal of Section 69 Counts*[4]

Section 69 states: "Every person who *attempts, by means of any threat or violence,* to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who *knowingly resists, by the use of force or violence*, the officer, in the performance of his or her duty, is punishable by a fine not exceeding ten thousand ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment." (§ 69, subd. (a), italics added.)

As the italicized wording indicates, "[t]he statute sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 814

---

[4] "When reviewing a trial court's denial of a section 1118.1 motion for acquittal, we apply the substantial evidence standard of review. [Citation.] Likewise, when a conviction is challenged on appeal for insufficient evidence to support it, we apply the substantial evidence standard of review. [Citations.] In applying that substantial evidence standard, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence to support the conviction. [Citations.] Substantial evidence is evidence that is reasonable, credible, and of solid value such that a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We do not reweigh the evidence, resolve conflicts in the evidence or reevaluate the credibility of witnesses." (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 41–42.)

11

(*Manuel G.*); accord, *Smith, supra*, 57 Cal.4th at pp. 240–241; *People v. Kruse* (2020) 56 Cal.App.5th 1034, 1046–1047.)  Thus, the distinction between the two ways in which the offense can be committed is whether the defendant is " ' "attempting to deter" ' " an officer or is " ' "actually resisting" ' " an officer engaged in performing his or her duties.  (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 984–985 (*Carrasco*).)

Attempting to deter an officer can be established by " ' "[a] threat, unaccompanied by any physical force" ' and may involve either an officer's immediate or future performance of his [or her] duty."  (*Carrasco, supra,* 163 Cal.App.4th at p. 985, quoting *People v. Lacefield* (2007) 157 Cal.App.4th 249, 255, disapproved on another ground as stated in *Smith, supra*, 57 Cal.4th at p. 242.)  "The actual use of force or violence is not required. (See [*Manuel G., supra,* 16 Cal.4th] . . . at p. 814 ["A threat, unaccompanied by any physical force, may support a conviction for the first type of offense under section 69."].)  (*Smith, supra,* 57 Cal.4th at p. 240; *Carrasco, supra,* 163 Cal.App.4th at p. 985.)  Further, "the statutory language [of the first clause of section 69, subdivision (a)] does not require that the officer be engaged in the performance of his or her duties at the time the threat is made.' "  (*Smith, supra,* at p. 240.)

Actually resisting requires that the defendant "resist" the officer " 'by the use of force or violence' " and further requires that the officer be acting lawfully at the time the defendant uses force or violence.  (*Smith, supra,* 57 Cal.4th at p. 241.)

Defendant was charged with, and tried on, the second theory—that he actually resisted the officers by use of force or violence.  There is no dispute that, at the time, the officers were engaged in performing their lawful duties.

### *The Trial Court Arguments*

After the prosecution rested, defendant moved for acquittal on the three section 69, subdivision (a) counts. Defense counsel argued that as charged—resisting the officers by use of force or violence—defendant could not commit the crimes without also committing assault, citing *People v. Brown.*[5] Given that one "cannot commit an assault with an unloaded firearm" and there was "no evidence" his gun was loaded, defendant "could not have committed an assault" and therefore could not have committed the greater offense of actually resisting an officer by use of force or violence.

The trial court observed, "Force and violence have, under California law, been stretched to a lot of different acts. Here, a gun was pointed. Even—not addressing assault but addressing [section] 69(a). I don't think you have to have an assault to have a [section] 69(a), even in the second way, the second type. [¶] I think force can be applied without an assault. There are instances of violence that are not an assault."

Defense counsel disagreed, arguing resisting an officer, rather than threatening to interfere with an officer, "requires force and violence, and there [was] no application of force, which is synonymous with violence. They're the same things. And there's case law which supports that as well."

The court saw it differently—that "force and violence" are not the same thing. "They are different, by definition, under law. [¶] I think, in the totality of the circumstances, there were violent acts that have been testified to in the context of what was happening, with the appearance of force, which I don't think is determinative. [¶] . . . I disagree that in all circumstances an assault is required for the second type of resisting an executive officer. I

---

[5] *People v. Brown* (2016) 245 Cal.App.4th 140 (*Brown*).

13

don't agree with that theory." The trial court then indicated it would deny the motion.

Defense counsel persisted, asserting "[t]here would be no reason to have two separate ways of violating section 69 if the first one was synonymous with the second one. But there's two different ways, and there was an election to choose the second one, which required force and violence. If there was an election to choose threats, I would have no argument that this was a threatening act."

The trial court remained of the view that an assault was not required to find force or violence, and "[i]t can happen without an assault."

### *Analysis*

Defendant renews his tri-partite argument on appeal—that assault is a necessarily included lesser offense of resisting an officer under section 69, subdivision (a), assault cannot be committed with an unloaded firearm, and since there was no evidence defendant's gun was loaded, he did not assault the officers and therefore could not commit the greater offense of resisting the officers under section 69, subdivision (a). Defendant relies solely on *Brown* to establish the threshold predicate of his argument—that an assault under section 240 is a necessarily included lesser offense of resisting an officer under section 69, subdivision (a).

The Attorney General concedes "for [the] purposes of this case that the weight of precedent rules that an assault may not be committed with an unloaded weapon." He disagrees, however, that assault is a necessarily included lesser offense of resisting an officer under section 69, subdivision (a).

We first consider *Brown.* In that case, the prosecution and defense presented "two starkly different" scenarios as to what happened at the scene of the alleged offense. The officers testified they observed 67-year-old Brown

14

riding his bicycle on the sidewalk, while wearing headphones and without a light, violations of the municipal code and Vehicle Code. Despite orders to do so, Brown refused to stop or get off of his bicycle, and two officers, who were "decades younger than Brown . . . and in excellent physical condition," eventually cornered Brown and arrested him after a brief altercation in which Brown suffered a fractured rib and knots on his head and one officer suffered "a 'boxer's fracture' to the knuckle of his right hand." (*Brown, supra*, 245 Cal.App.4th at p. 145.) The officers admitted they struck the defendant, but only after he swung his fists at them. (*Id.* at pp. 146–147.) Brown, in contrast, testified he fell off his bicycle and while facedown and not resisting, one of the officers pinned him to the ground and struck him in the head without provocation. (*Id.* at p. 147.)

Consistent with our Supreme Court's holding in *Smith, supra,* 57 Cal.4th at pages 242 to 243—that simple resisting an officer under section 148, subdivision (a), is a necessarily included lesser offense of resisting an officer under section 69, subdivision (a)—the trial court duly instructed the jury on simple resisting. (*Brown, supra*, 245 Cal.App.4th at p. 151.)

On appeal, Brown asserted for the first time that the jury "should have been given an additional option—convicting him of misdemeanor simple assault as [an additional] lesser included offense to a section 69 violation." (*Brown, supra*, 245 Cal.App.4th at p. 151.) He maintained the jury was denied the option of finding both the prosecution and defense versions of the facts "partly true." Specifically, "even if the jury believed he swung at the officers, the jury could have found the officers initiated the violence by jumping on him and beating him as he lay prone on the ground, prepared to surrender." (*Ibid.*)

15

The appellate court agreed, stating "[b]ecause the accusatory pleading used the conjunctive to charge Brown with both ways of violating section 69, and *it is not possible to violate the statute in the second way without committing an assault*, we conclude that assault was necessarily a lesser included offense of section 69 under the accusatory pleading test. (See *Smith, supra,* 57 Cal.4th at pp. 242–243 [§ 148(a) was necessarily a lesser offense of § 69 when accusatory pleading charged the defendant with both ways of violating § 69].)" (*Brown, supra*, 245 Cal.App.4th at p. 153, italics added.)

This single sentence, supported by the "see" citation to *Smith,* is the *entirety* of the court's analysis. (*Brown, supra*, 245 Cal.App.4th at p. 153.) We also note that in *Brown* the Attorney General conceded section 240 was a necessarily included lesser offense of the section 69 charge. (*Brown,* at p. 153.)

The Attorney General makes no such concession in this case and points to the paucity of *Brown's* legal analysis. He also points out the instant case involves significantly different facts *Brown* had no occasion to consider. We conclude the Attorney General's declination to concede the threshold predicate of defendant's argument and his view that, here, the section 69, subdivision (a) resisting charges were properly submitted to the jury rests on solid legal footing.

We begin by examining *Smith, supra,* 57 Cal.4th 232, which *Brown* cited as the sole support for its pronouncement that "it is not possible to violate the statute in the second way without committing an assault." (*Brown, supra,* 245 Cal.App.4th at p. 153.) In *Smith,* the defendant was convicted under section 69, subdivision (a) and on appeal asserted the trial court erred in failing to instruct the jury on section 148, subdivision (a)(1) as a lesser included offense. (*Smith, supra,* 57 Cal.4th at p. 236.) Section 148,

subdivision (a)(1) provides in pertinent part, "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."  (§ 148, subd. (a)(1).)

The courts of appeal had reached different conclusions as to whether simple resisting under section 148, subdivision (a)(1) is a necessarily lesser included offense of section 69, subdivision (a), given that section 69, subdivision (a) embraces two theories, only one of which, namely the second theory, could be said to be an aggravated form of resisting under section 148, subdivision (a)(1). (*Smith, supra*, 57 Cal.4th at pp. 239, 241–242.)  After discussing both theories—attempting, by means of threat or violence, to deter an officer from performing his or her duty, and resisting, by use of force or violence, an officer in the performance of his or her duties—the high court ruled simple resisting under section 148, subdivision (a)(1) is a necessarily included lesser offense of section 69, subdivision (a) when the accusatory pleading invokes the second theory and alleges the defendant resisted, by use of force or violence, an officer in the performance of his or her duties.  (*Smith*, at pp. 241–242.)  This holding—that section 148, subdivision (a)(1) is a necessarily included lesser offense of section 69, subdivision (a)—also necessarily means that "willfully resist[ing], delay[ing], or obstruct[ing]" under section 148, subdivision (a)(1) collectively comes within "knowingly resist[ing]" under section 69, subdivision (a).  The high court went on to reaffirm that trial courts have a sua sponte obligation to instruct on

17

necessarily included lesser offenses, regardless of whether the defendant requests such instructions at trial. (*Smith*, at p. 244.)[6]

*Smith* made no mention of assault, and we fail to discern how the high court's analysis of simple resisting under section 148, subdivision (a)(1), even inferentially supports the conclusion assault is also a necessarily lesser included offense of section 69, subdivision (a) when the accusatory pleading charges the defendant with resisting an officer in the performance of his or her duties.

We therefore turn to the language of section 69, subdivision (a), which states, "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both." (§ 69, subd. (a).)

As the Attorney General points out, neither "force" nor "violence" is defined in section 69. (§ 69.) Nor are they defined in the general definitional provisions of the Penal Code. (§ 7.) These words must therefore "be construed according to the context and the approved usage of the language" unless they have "acquired a peculiar and appropriate meaning in law." (§ 7, subd. (16); see *People v. Jones* (1971) 19 Cal.App.3d 437, 447 ["As a general rule, ordinary words do not require definition; they are presumed to be understood by the jurors."].)

---

[6] It also concluded the trial court did not err in failing to give a section 148, subdivision (a)(1) instruction because no evidence was presented that "the offense was less than that charged." (*Smith, supra*, 57 Cal.4th at p. 245.)

Our Supreme Court has concluded several times that "force," when not circumscribed by other language, is to be understood as having "a common usage meaning, rather than a specialized legal definition." (E.g., *People v. Griffin* (2004) 33 Cal.4th 1015, 1024–1026 (*Griffin*).) In *Griffin,* the court considered the term as used in the forcible rape statute (§ 261, subd. (a)(2)). In concluding "force" is to be understood according to common usage and not in a specialized manner, the court observed that prior to amendment, the statutory language qualified "force" as that "necessary under the circumstances to overcome the victim's resistance." (*Griffin, supra,* at p. 1025.) Given that the Legislature had removed this qualification, the high court concluded "force" carries its common usage meaning. (*Ibid.*) In *People v. Anderson* (1966) 64 Cal.2d 633, 640, the high court ruled the "terms 'force' and 'fear' " as used in the robbery statute "have no technical meaning peculiar to the law and must be presumed to be within the understanding of jurors." (*Ibid.*) It therefore rejected the defendant's argument that the trial court was required to give pinpoint instructions defining the terms. (*Ibid.*; see also *People v. Sullivan* (2007) 151 Cal.App.4th 524, 544 ["[t]he requirement of use of force or fear" in the robbery statute "has no technical meaning which must be explained to jurors, but rather the terms articulated in the statute have established common meaning"].)

The unqualified term "violence" likewise has no technical meaning in our criminal law. (See, e.g., *People v. Collins* (1992) 10 Cal.App.4th 690, 698 (*Collins*) ["The words, 'force' and 'violence' are words of ordinary meaning and require no further definition."].) "Violence" also has a variety of dictionary definitions. It has been defined as the "exercise of physical force against a person, property, etc.; physically violent behavior or treatment." (Oxford English Dict. Online (3d ed. 2015).)

19

<http://dictionary.oed.com/cgi/entry/00277885> [as of July 8, 2024].) It has also been defined as "intense, turbulent, or furious and often destructive action or force" or "vehement feeling or expression." (Merriam-Webster Dict. Online (2020) <https://www.merriam-webster.com/dictionary/violence> [as of July 8, 2024]; see *People v. Sorden* (2021) 65 Cal.App.5th 582, 600 [" 'When attempting to ascertain the ordinary, usual meaning of a word [in a statute], courts appropriately refer to the dictionary definition of that word.' "].)

In contrast to the absence of language in section 69 constraining the meaning of "force" and "violence," other criminal statutes include such language, narrowing the meaning of those terms in those statutory contexts. For example, the Legislature has utilized the phrase "force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death" or comatose or paralytic state, where it wants to set a benchmark for the meaning of the term. (§ 273ab, subds. (a), (b) [defining assault resulting in death, comatose state, or paralysis of child under the age of eight].) And it has used the phrase "force or violence upon the person of another" to describe conduct requiring physical contact. (§§ 242 [defining battery as "any willful and unlawful use of force or violence upon the person of another"], italics added; 136.1 [defining witness tampering as including an "express or implied threat of force or violence, *upon* a witness or victim or any third person or the property of any victim, witness, or any third person"], italics added.)

The Legislature could have included such language in section 69, subdivision (a). But it did not. This, in and of itself, is significant; it is more so because section 242 and section 69 were enacted at the same time as part of our state's original 1872 Penal Code. (§§ 69, 242, as enacted by Pen. Code of 1872; see *In re C.H.* (2011) 53 Cal.4th 94, 107 ["When the Legislature uses

20

different words or phrasing in contemporaneously enacted statutory provisions, a strong inference arises that a different meaning was intended."], superseded by statute on another ground as stated in *In re Edward C.* (2014) 223 Cal.App.4th 813, 824.)

We therefore conclude resisting an officer by "force or violence" under section 69, subdivision (a) does not require either a threshold quantum of force or violence, or the use of force or violence "upon the person of" the officer. The statutory language does not, in other words, require the defendant to have actual physical contact with the officer. The court in *People v. Bernal* (2013) 222 Cal.App.4th 512 (*Bernal*), made a similar observation, stating "[b]y interpreting section 69 in terms of the *risk of violence* created by any forceful resistance to arrest, rather than in terms of any intent to commit harm, the court in [*People v.*] *Martin* [(2005) 133 Cal.App.4th 776, 782–783] implicitly eliminated any requirement that a defendant intend to harm a police officer or direct force or violence toward an officer. [¶] In sum, given the express terms of the statute and the holdings in [prior cases] we conclude that forceful resistance of an officer by itself gives rise to a violation of section 69, without proof force was directed toward *or used on* any officer."[7] (*Bernal, supra,* 222 Cal.App.4th at p. 520, italics added.)

---

[7] The defendant in *Bernal* did have physical contact with the officer from whom he tried to escape. While the officer was holding his hand, the defendant pushed against the officer and tried to begin running, dragging the officer about 10 yards down a bike trail until they both fell to the ground. (*Bernal, supra,* 222 Cal.App.4th at p. 520.) The record also "show[ed] that, by swinging his hips first to one side and then to the other," the defendant "attempted to free himself from [the officer's] grasp." (*Ibid.*) "[T]his forceful and violent conduct amply supported his conviction of violating section 69." (*Ibid.*)

21

We thus come to whether a person must necessarily commit assault under section 240 in resisting an officer by "the use of force or violence" under section 69, subdivision (a). And in answering this question we take into account that resisting under section 69, subdivision (a) includes delaying or obstructing an officer, the terminology used in section 148, subdivision (a)(1), which our Supreme Court has held is a necessarily included offense of a resisting charge under section 69, subdivision (a). (See *Smith, supra,* 57 Cal.4th at pp. 241–242.)

An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) The offense has been described as " 'unlawful conduct immediately antecedent to battery.' " (*People v. Williams* (2001) 26 Cal.4th 779, 786 (*Williams*).) It is "an incipient or inchoate battery; a battery is a consummated assault." (*People v. Colantuono* (1994) 7 Cal.4th 206, 216, superseded by statute on other grounds as stated in *People v. Conely* (2016) 63 Cal.4th 646, 660, fn. 4.) In an assault the "underlying conduct must immediately precede the commission of the violent injury; that is, " ' " [t]he next movement would, *at least to all appearance,* complete the battery.' " ' " (*People v. Rundle* (2008) 43 Cal.4th 76, 144, disapproved on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *Williams, supra,* 26 Cal.4th at p. 788 [an assault is conduct a reasonable person would realize "would directly, naturally and probably" result in a battery].)

It is immediately apparent that the language of section 240 differs markedly from that of section 69, subdivision (a). Section 240 requires "an attempt" and "present ability" to "commit a violent injury" "on the person of another." Section 69 contains none of this language but speaks only in terms

of "knowingly resist[ing]" an officer by "use" of "force or violence." (§ 69, subd. (a).)

Just as the Legislature could have parroted the language of the battery statute in drafting section 69, subdivision (a), it could have employed the language of section 240. The Legislature could have, for example, drafted the second phrase of section 69, subdivision (a) to say any person "who knowingly resists, by assaulting," or "by assaulting or battering," an officer in the performance of his or her duty, commits the offense. But it did not. Again, this, in and of itself, is significant; moreover, section 240, like section 242, was enacted at the same time as section 69, as part of our state's original 1872 Penal Code (§§ 69, 242, as enacted by Pen. Code of 1872), bolstering the presumption that the materially different language of these statutes is of consequence.

Indeed, the Legislature has expressly used the term "assault" in other statutes pertaining to the use of force against an officer. (E.g., § 245, subd. (c) ["Any person who commits an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties," commits the offense.].) This reinforces that the Legislature knows how to refer to "assault," or to use the terminology employed in section 240, when it chooses to do so. It did not choose to do so in section 69. (See *People v. Johnson* (2020) 50 Cal.App.5th 620, 633–634 [" ' "[W]here the Legislature makes express statutory distinctions, we must presume it did so deliberately, giving effect to the distinctions, unless the whole scheme reveals the distinction is

23

unintended." ' " (Quoting *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 502.)].)

Our Supreme Court has also focused on the absence of the unique language of section 240 in holding assault is not a necessarily included lesser offense of several other crimes. (See *People v. Licas* (2007) 41 Cal.4th 362, 367 ["assault with a firearm not a lesser included offense of shooting at another person from a vehicle because the latter offense (unlike assault) does not require that the perpetrator have a present ability to commit a violent injury on another person"]; *People v. Wolcott* (1983) 34 Cal.3d 92, 99 [assault not a lesser included offense of robbery by threat; robbery statute requires "[n]either an attempt to inflict violent injury, nor the present ability to do so"].)

As we have recited, defense counsel took issue with the trial court's view that section 69, subdivision (a)'s use of the disjunctive "force" *or* "violence" indicates the terms encompass different kinds of conduct. However, the court was correct in recognizing the significance of the Legislature's use of the disjunctive. (See *Rubio v. Superior Court* (2016) 244 Cal.App.4th 459, 473 ["The Legislature's use of the disjunctive 'or' is telling. ' "The plain and ordinary meaning of the word 'or' is well established. When used in a statute, the word 'or' indicates an intention to designate separate, disjunctive categories." ' " (Quoting *Eddie E. v. Superior Court* (2015) 234 Cal.App.4th 319, 327.)]; *California Correctional Peace Officers Assn. v. Tilton* (2011) 196 Cal.App.4th 91, 96 [in its ordinary sense in a statute, " ' " 'the function of the word 'or' is to mark an alternative such as 'either this or that' " ' "].)

Counsel maintained, however, that case authority holds "force" and "violence" have the "same" meaning. This authority consisted of assault and

battery cases. Indeed, in that context " '[i]t has long been established . . . that "the least touching" may constitute battery' " (*People v. Rocha* (1971) 3 Cal.3d 893, 899, fn. 12), and therefore " '[t]he terms "violence" and "force" are synonymous when used in relation to assault [and battery], and include any application of force even though it entails no pain or bodily harm and leaves no mark.' " (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 207, quoting *People v. Flummerfelt* (1957) 153 Cal.App.2d 104, 106.)

But as we have discussed, although the Legislature enacted the assault, battery, and aggravated resisting statutes at the same time, it employed different terminology in each, and the language of section 69, subdivision (a), differs significantly from the language of sections 240 and 242. Accordingly, case law interpreting the language of the latter two statutes is not controlling as to the quite different language of section 69, subdivision (a). (See *Collins*, *supra*, 10 Cal.App.4th at p. 696 ["force or violence" as used in mentally disordered statute (§ 2962, subds. (d)(1) & (e) [MDO]) are not synonymous, they are words of ordinary meaning requiring no further definition, and it is error to instruct MDO jury with battery instruction defining "force or violence"].)

Furthermore, the grammatical structure of section 69, subdivision (a), itself, makes clear that "force" and "violence," as used in this statute, are not synonymous. In addition to the fact these two terms are separated by the disjunctive "or," the first clause of section 69, subdivision (a) states anyone who "attempts, by means of any threat or violence" to deter an officer in the performance of his or her duties commits the offense. (§ 69, subd. (a).) Thus, the first clause uses only the terms "threat" and "violence," and does not also include the term "force." Rather, the term "force" is used only in the second clause. (§ 69, subd. (a).) The inescapable conclusion is that the Legislature

25

understood "violence" and "force" to have different meanings and to refer to different kinds of conduct.

Defendant maintains otherwise, arguing that "force" does not appear in the initial clause because that clause pertains only to an "attempt" by means of a "threat or violence" to deter an officer. (§ 69, subd. (a).) He asserts that "force" appears in the second clause because it applies when a person is actually resisting, and the term spells out the measure of "violence" required to commit the offense. According to defendant, whereas the first clause "means to deter or prevent the officer's future performance by a violent threat," the second clause "means to deter or prevent the officer's present performance of a duty by the application of violent force, an assault." This argument disregards the disjunctive "or" in both the first and second clauses of the statute. The first clause does not refer to "a violent threat;" rather, it refers to an attempt, by means of "threat *or* violence," to deter an officer. The second clause, in turn, does not refer to "violent force;" rather, it refers to resisting an officer by "force *or* violence." (§ 69, subd. (a), italics added; see *People v. Dyer* (2002) 95 Cal.App.4th 448, 455 [rejecting as "untenable" defendant's argument that MDO statute's listing of crimes in which the prisoner "used force *or* violence *or* caused serious bodily injury" (§ 2962, subd. (e)(2)(P)) was confined to crimes against persons since list "is written in the disjunctive"].)

We therefore conclude that, as used in section 69, subdivision (a), "force" and "violence" have different meanings, neither has any peculiar legal meaning, and both are to be understood and applied in accordance with common usage of the terms.

It remains for us to consider whether "force" or "violence" applied in accordance with common usage can reasonably embrace conduct that may not

constitute an assault under section 240. Bearing in mind that resisting under section 69, subdivision (a) includes delaying or obstructing an officer (see *Smith, supra,* 57 Cal.4th at pp. 241–242), we have no hesitation concluding the answer is "yes."

The instant case is illustrative. A reasonable person—confronted by an individual with a gun, who takes a firing stance, racks and raises the gun, aims it squarely at the person's head (so the person is looking "down the barrel of the gun" and believes he is about to die), and pulls the trigger— could, and undoubtedly would, consider the aggressor to have engaged in violent conduct. The targeted person almost certainly will not know whether or not the gun is loaded or operable. Thus, these distinctions will also almost certainly be immaterial to the targeted person—whether the gun is loaded or unloaded, operable or non-operable, the targeted person suffers the same terror of imminent injury or death, and the gun has the same coercive effect or, as in the case of the officers here, the same disruptive and obstructive effect on their efforts to subdue and arrest defendant.[8]

---

[8] Indeed, in other contexts, the courts have pointed out that regardless of the operability of a firearm, its use enhances the violence and risk attendant to a defendant's conduct. The crime of carrying a concealed weapon (former § 12025, subd. (b) [now § 25400]), for example, does not require that the gun be loaded or operable. (*People v. Marroquin* (1989) 210 Cal.App.3d 77, 81–82 [the Legislature's concern is "the imminent threat to public safety from easily obtainable, concealable weapons used to perpetuate violent crime;" "the substantiality of that threat exists irrespective of operability"].) Even a gun use enhancement does not depend on the operability of the firearm. (§ 12022.5; *In re Tameka C.* (2000) 22 Cal.4th 190, 196 [use " 'as employed in this statute [section 12022.5] should be broadly construed, consistent with common usage, to check the magnified risk of serious injury which accompanies any deployment of a gun in a criminal endeavor' " (quoting *People v. Granado* (1996) 49 Cal.App.4th 317, 322)]; *People v. Williams* (1976) 56 Cal.App.3d 253, 255 [gun use

The Attorney General posits another example—a person slashes the tires of a patrol vehicle to impede the officer's pursuit in order to evade arrest. Such conduct does not constitute assault of the officer under section 240, but a jury could reasonably characterize it as an act of "force or violence" preventing the officer from performing his or her duties. We observe the same could be said if a person sets fire to a patrol car to preclude pursuit and arrest by the officer. Such conduct does not constitute an assault on the officer but could reasonably be characterized as an act of violence preventing the officer from performing his or her duties. So too, if a person were to grab a bystander to use as a shield to stall an officer's pursuit and facilitate escape. The person does not commit assault on the officer, but the person's conduct certainly could be characterized as an act of "force or violence" preventing the officer from performing his or her duties.

Moreover, we see no public policy reason why resisting, delaying or obstructing an officer under section 69, subdivision (a) should be confined to conduct that meets the legal definition of assault. As we have discussed, there is no statutory contextual reason for departing from the rule that use of the disjunctive "or" has significance, or the general proposition that "force" and "violence" are words of ordinary parlance to be understood in accordance with their common usage. The purpose of section 69, subdivision (a) is to punish more severely those who engage in acts of aggravated resisting, delaying or obstructing an officer. Such conduct not only increases the risk to the officer's personal safety, but also to that of the person trying to resist, delay, or obstruct the officer, and to that of any bystanders. Here, the officers came within a hair's breadth of shooting defendant, and they were also

enhancement statute "imposes no requirement upon the People, either to produce the gun or to prove it was operable"].)

28

concerned about potentially stray shots injuring anyone in neighboring buildings. In our view, the dangerous scenario that unfolded here comes well within the ambit of section 69, subdivision (a).

Thus, while we understand why, given the statutory language, assault cannot be committed with an unloaded or inoperable firearm (unless used as bludgeon), we see no reason why that should be the case under the entirely different language section 69, subdivision (a).[9]

We therefore reject the foundational premise of defendant's argument—that assault is a necessarily included lesser offense of a resisting charge under section 69, subdivision (a)—and, in turn, reject his contention that because there was no evidence his gun was loaded and he therefore could not be convicted of assault, he could not be convicted of the section 69, subdivision (a) resisting charges and was entitled to acquittal. Rather, we agree with the Attorney General that determining whether defendant used "force" or "violence" to resist the officers performing their duties was a matter properly left to the jury.[10]

---

[9] We note that in light of the endemic use of firearms and the fear and violence they engender, regardless of whether they are loaded or unloaded, operable or inoperable, one court has urged that even in the context of assault the rule that the offense cannot be committed with an unloaded or inoperable firearm should be reexamined. (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 542, fn. 10 [the "operability" requirement is an anachronism which is incompatible with the realities of a society in which the unlawful use of guns is a major and continuing problem].)

[10] Given our rejection of defendant's argument that he was entitled to acquittal on the section 69, subdivision (a) counts, we need not consider his related argument that he was entitled to a pinpoint instruction on assault.

We also need not, and do not, address the Attorney General's alternative argument that defendant's "racking of the pistol, pointing and pulling the trigger formed substantial evidence that [the gun] was loaded," citing *People v. Rodriguez* (1999) 20 Cal.4th 1. In *Rodriguez*, our Supreme

29

*Sentencing Issues*

### *The Trial Court Proceedings*

The jury found true the aggravating factor that defendant was armed with or used a weapon at the time of the commission of the crime (Cal. Rules of Court, rule 4.421(a)(2)).[11] The jury found not true three other aggravating factors—that the offense involved great violence, great bodily injury, the threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (rule 4.421(a)(2)), the offense involved "planning, sophistication, or professionalism" (rule 4.421(a)(8)), and defendant engaged in "violent conduct that indicates a serious danger to society" (rule 4.421(b)(1)).

In its sentencing report, the probation department recommended an aggregate term of eight years four months based in part on three other aggravating factors—defendant was convicted of "other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed" (rule 4.421(a)(7)), "defendant's prior convictions

Court reversed the Court of Appeal's determination that there was insufficient evidence defendant's gun was loaded to support his conviction of assault with a firearm. (*Id.* at pp. 5, 10–12.) The high court observed the defendant's own "statements and behavior while making an armed threat against a victim may warrant a jury's finding the weapon is loaded." (*Id.* at p. 12.) We note, however, that in the instant case, the prosecutor never argued the gun was loaded but argued, "It is a use of force to take a gun, a gun that you don't know if it is loaded, don't know if it [is] unloaded and point it so that you are looking down the barrel, so you are seeing that this might be your last moments on this earth, that is use of force. That is a use of violence." Nor did the prosecutor object to defendant's assertion during closing argument that there was no evidence the gun was loaded. The prosecutor also never argued during the hearing on defendant's motion for acquittal that there was substantial evidence the gun was loaded

[11] All further rule references are to the California Rules of Court.

as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness" (rule 4.421(b)(2)), and "defendant's prior performance on probation, mandatory supervision, postrelease community supervision, or parole was unsatisfactory" (rule 4.421(b)(5)).[12]

In his sentencing brief, defendant asked the trial court to either grant probation, dismiss the firearm enhancement or strike the additional term of imprisonment pursuant to section 1385, or impose the mitigated term pursuant to section 1170, subdivision (b)(6).

The prosecutor urged the court to impose the aggravated term given the aggravating factor found true by the jury and three aggravating factors identified in the probation report.

At the outset of the sentencing hearing, the court stated it had reviewed counsels' briefs and the probation report. It then heard from defendant's sister and defendant, and listened to the prosecutor read from a written statement by defendant's mother, each of whom discussed defendant's traumatic childhood and debilitating drug use.

The court indicated it was not going to grant probation and was, instead, considering the midterm. It then turned to "the three factors in aggravation that are typically left up to the court"—namely, that defendant had been convicted of other crimes for which consecutive sentencing could be

---

[12] The department identified the following mitigating facts: the search of defendant's car revealed "an operable but unloaded pistol;" it did not "appear any victims were shot, despite the defendant pulling the trigger at least once during the incident;" and it appeared the firearm "was presumably unloaded." The department additionally noted, based on information provided by defendant's family and by defendant during his probation interview, "it appears [defendant] experienced psychological and physical childhood trauma that contributed to his substance abuse and likely his declining mental health as an adult, which appear to have been underlying factors in the commission of these crimes."

imposed (rule 4.421(a)(7)), had suffered numerous prior convictions (rule 4.421(b)(2)), and had performed poorly on prior grants of probation (rule 4.421(b)(5)). The court determined all three factors applied.

Weighing these three aggravating factors against "what they call now the super mitigant,"[13] the trial court concluded "they balance out. . . . I don't find one group of aggravating factors more persuasive than the super mitigant or the super mitigant [of] more weight than the aggravating factors under (a)(7) [conviction of other crimes for which consecutive sentences could have been imposed], (b)(2) [convictions that "are numerous or of increasing seriousness"], and (b)(5) [unsatisfactory performance on probation]. To put it simply in my mind they kind of cancel each other out. [¶] And I look at the offense, the circumstances, what happened, which was very, very, very dangerous and serious, and I do believe that the midterm on count 1 should be imposed."

Defense counsel then inquired, "what evidence is the court relying on as to 4.421(b)(2) and 4.421(b)(5), that would be the numerous convictions and the poor past performance on probation?" The court replied, "Those partly come through referenced in the pre-sentence report, but if you . . . look at the

---

[13] A "super mitigant" is a "mitigating factor enumerated in Pen[al Code section] 1170(b)(6) that, if established as a contributing factor to the commission of the offense, limits the court to imposition of the low term of imprisonment, unless the court finds the aggravating circumstances outweigh the mitigating circumstances so that imposition of the low term would be contrary to the interests of justice" or "a mitigating factor enumerated in Pen[al Code section] 1385(c)(2) that requires or weighs greatly in favor of the court dismissing or striking any additional punishment for conduct and status enhancements unless the court finds there is a likelihood that dismissal would result in physical injury or serious danger to others. " (Cal. Criminal Law:  Procedure and Practice (Cont.Ed.Bar 2d ed. 2023) § 37.5.)

32

court record in the file there are quite a few pleadings that reference the prior probation grants and those facts and circumstances. So partly by reading just the court record, plus there is another case that's even on calendar today that has other offenses, but also through the probation pre-sentence report and references as well to those grants of probation. There is a juvenile record. There is an adult record of convictions in Sonoma County dating back to . . . 2011, some of those are misdemeanors. So they are all pretty much listed in the pre-sentence report. I acknowledge most of them are misdemeanors but there is poor performance there. There is [*sic*] also some reports from the jail of rule breaking and warnings, second and third warnings and then not complying. So I'm just not confident [defendant] can succeed and follow probation's plan."

Defense counsel replied, "I understand. I just wanted to understand the court's basis. I do want to for the record state my objection to reliance on the probation report. I'm not sure if that's proper for this purpose. Just for the record I just want that to be noted as well as the court looking at the prior pleadings within the file in this case as well."

The trial court proceeded to sentence defendant to seven years four months (consisting of the midterm of two years for count 1, four years for the attached firearm enhancement, and eight months each for counts 6 and 8).[14]

### *Section 1170, subdivision (b)(3)*

Defendant maintains he is entitled to a new sentencing hearing because the trial court was assertedly "unaware of its discretion" under section 1170, as amended by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3, eff. Jan. 1, 2022). He claims the "record shows the court was unaware that amended section 1170 did not permit the court to

---

[14] The court stayed the two-year sentence for count 5.

33

select a term of imprisonment based on aggravating factors unless they were either found by the jury or the defendant stipulated to them" and, specifically, that the court's determination that his prior convictions were "numerous or of increasing seriousness" (rule 4.421(b)(2)) and he performed poorly on prior grants of probation (rule 4.421(b)(5)) violated section 1170, subdivision (b)(3). In other words, on appeal, defendant does *not* argue that his prior convictions were not properly proven. Rather, he argues the trial court could not, under subdivision (b)(3), go on, and on the basis of his prior convictions, determine they were "numerous or of increasing seriousness" (rule 4.421(b)(2)) or determine that he performed poorly on prior grants of probation (rule 4.421(b)(5)).

In *People v. Wiley* (2023) 97 Cal.App.5th 676, 686 (*Wiley*), review granted March 12, 2024, S283326, the court considered and rejected this same argument, observing that the appellate courts are divided on the import of amended section 1170, subdivision (b)(3), which states, in pertinent part, "Notwithstanding paragraphs (1) and (2) [of section 1170, subdivision (b)], the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury. This paragraph does not apply to enhancements imposed on prior convictions." (§ 1170, subd. (b)(3).)

"Some courts have treated the prior conviction exception under section 1170, subdivision (b)(3) as having the same scope as the exception under the Sixth Amendment. ([*People v.*] *Pantaleon* [(2023)] 89 Cal.App.5th [932,] 938 [*Pantaleon*] [under 6th Amend. and § 1170, subd. (b)(3), 'the fact of a prior conviction includes "other related issues that may be determined by examining the records of the prior convictions" ']; accord, *People v. Ross* (2022) 86 Cal.App.5th 1346, 1353 . . . , review granted Mar. 15, 2023,

34

S278266 [under § 1170, subd. (b)(3), trial court could rely on certified conviction records to consider recidivism-based aggravating factors under rule 4.421(b), including the defendant's multiple offenses, prior prison term, and poor performance on parole and probation; trial court committed Senate Bill 567 error, however, by relying on 'crime-based aggravating factors' set forth in rule 4.421(a)]; *People v. Flowers* (2022) 81 Cal.App.5th 680, 685–686, . . . review granted Oct. 12, 2022, S276237.)"  (*Wiley, supra,* 97 Cal.App.5th at p. 684, review granted.)

"Other courts have suggested that, under section 1170, subdivision (b)(3), such factors as the increasing seriousness of a defendant's convictions must (at least in some circumstances) be submitted to a jury rather than determined by the court from a certified record of convictions. (See *People v. Butler* (2023) 89 Cal.App.5th 953, 959, 961, 955, . . .  review granted May 31, 2023, S279633 [in analyzing prejudice from Senate Bill 567 error, appellate court stated (1) prior prison terms 'could have been proven by certified records of conviction,' but (2) it was 'not clear whether a jury would have found beyond a reasonable doubt that Butler's four admitted prior convictions were of "increasing seriousness" ']; *People v. Falcon* (2023) 92 Cal.App.5th 911, 952, fn. 12, 953–955, . . . review granted Sept. 13, 2023, S281242 (*Falcon*) [noting 'amended section 1170(b) now effectively incorporates Sixth Amendment principles,' but questioning whether § 1170, subd. (b)(3) has the same scope as the constitutional exception for prior convictions, and ultimately declining to resolve that question]; see also *People v. Dunn* (2022) 81 Cal.App.5th 394, 404–405 . . .  & fn. 8, review granted Oct. 12, 2022, S275655 [some aggravating factors were proved by certified record of conviction or by defendant's admission; that defendant was on probation at time of charged offense was not proved by those methods, so

35

upper term sentence was erroneous due to retroactive application of Senate Bill 567].)" (*Wiley, supra,* 97 Cal.App.5th at pp. 684–685, review granted.)

After a thorough analysis of the Sixth Amendment and amended section 1170, subdivision (b)(3)—which " 'preserves [the] distinction' " in Sixth Amendment jurisprudence establishing " ' "the right to a jury trial does not apply to the fact of a prior conviction" ' "—*Wiley* agreed with those courts concluding "the prior conviction exception in section 1170, subdivision (b)(3) includes both the fact of a prior conviction and 'other related issues' [citation] that may be determined from a certified record of conviction. (See [*People v.*] *Gallardo* (2017) 4 Cal.5th [120,] 138 . . . ['Our precedent instructs that determinations about the nature of prior convictions are to be made by the court, rather than a jury, based on the record of conviction.'].)" (*Wiley, supra,* 97 Cal.App.5th at p. 685, review granted, quoting *Pantaleon, supra,* 89 Cal.App.5th at p. 938.) *Wiley* further agreed that "these related issues include the two factors [defendant] contends the trial court should not have considered—the increasing seriousness of [his] convictions (rule 4.421(b)(2)) and his poor prior performance on probation (rule 4.421(b)(5))." (*Wiley, supra,* at pp. 683–685.)

We agree with *Wiley* and reach the same conclusion here.

### Section 1170, subdivisions (b)(5) and (b)(6)

Defendant also claims the trial court violated section 1170, subdivisions (b)(5) and (b)(6) by both imposing a gun use enhancement under section 12022.5, subdivision (a) and relying on the jury's true gun use aggravation finding (rule 4.421(a)(2)) to justify imposition of the midterm rather than the low term under subdivision (b)(6).

Subdivision (b)(5) states, "The court may not impose an *upper* term by using the fact of any enhancement upon which sentence is imposed under any

36

provision of law." (§ 1170, subd. (b)(5), italics added.) As the court explained in *Chavez Zepeda v. Superior Court* (2023) 97 Cal.App.5th 65, 74 (*Zepeda*), "Senate Bill 567 amended section 1170, subdivision (b) to make *the middle term the maximum* that may be imposed *absent* additional findings. (§ 1170, subd. (b)(1).) To comply with *Cunningham* [*v. California* (2007) 549 U.S. 270], section 1170(b)(2) now provides that a court may impose the upper term only if 'there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.' In its analysis of Senate Bill 567, the Senate Committee on Public Safety noted that the bill's proponents 'argue that this change is necessary to ensure that harsher sentences receive the greatest scrutiny and justification before they are imposed,' and that '[b]y allowing aggravating factors to be submitted to the factfinder, defendants will be better able to dispute the information on the record that may not be true.' (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 567 (2021–2022 Reg. Sess.) as amended Mar. 9, 2021, p. 4 (Senate Committee Analysis).)" (*Zepeda,* at p. 74.)

The trial court did not impose an upper term for any of the crimes of which defendant was convicted. Rather, it imposed the *midterm*. Defendant's argument is therefore more nuanced. He asserts the trial court violated section 1170, subdivision (b)(5) by including the jury's gun use aggravating factor (rule 4.421(a)(2)) in its weighing under section 1170, subdivision (b)(6) and concluding the midterm, rather than the low term, was the appropriate sentence.

Where the trial court finds a "supermitigant," as the trial court did here, section 1170, subdivision (b)(6) requires imposition of the low term "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances." (§ 1170, subd. (b)(6).)

It is clear from the record that *after* the trial court concluded the aggravating factors set forth in rule 4.421(a)(7) (defendant was convicted of other crimes for which consecutive sentencing could be imposed), rule 4.421(b)(2) (defendant had convictions that were "numerous or of increasing seriousness"), and rule 4.421(b)(5)) (defendant performed poorly on prior grants of probation) "balance[d] out" the "supermitigant" (defendant's traumatic upbringing and debilitating drug use), it went on to conclude that the jury's aggravated factor finding under rule 4.421(a)(2) (defendant was armed with or used a weapon at the time of the commission of the crime) and other grievous aspects of defendant's conduct tipped the balance, such that aggravating circumstances outweighed mitigating circumstances and permitted a midterm, rather than a low term, sentence under section 1170, subdivision (b)(6).

The Attorney General makes no response to defendant's subdivision (b)(5) and (b)(6) argument and, thus, effectively concedes the trial court violated section 1170, subdivision (b)(5) by both imposing a gun enhancement under section 12022.5, subdivision (a) and relying on the jury's gun use aggravation finding (rule 4.421(a)(2)) to justify imposing a higher term sentence than is otherwise required by section 1170, subdivision (b)(6). Rather, the Attorney General argues "most" of the aggravating factors relied on by the trial court were permissibly determined under section 1170 and therefore any sentencing error was harmless.

It has long been the rule that courts "generally cannot use a single fact both to aggravate the base term and to impose an enhancement." (*People v. Scott* (1994) 9 Cal.4th 331, 350; § 1170, subd. (b)(5); rule 4.420(g).) Accordingly, on appeal, we review the record to determine whether there is any substantial evidence of conduct supporting the aggravating factor *other* than the conduct supporting the enhancement. (See *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1775.) If the trial court could only have based the aggravating factor on the evidence giving rise to the enhancement, then the sentence must be reversed. (*Ibid.*)

Here, it is clear the trial court both sentenced defendant on the section 12022.5, subdivision (a) gun use enhancement *and* relied on the jury's gun use aggravated factor finding to justify departing from the low term otherwise required under section 1170 subdivision (b)(6). We therefore cannot conclude the trial court's "dual use" of defendant having brandished a gun was not prejudicial, and we must therefore reverse and remand for resentencing.

Given this conclusion, we need not reach defendant's additional section 1170, subdivision (b)(6) argument based on his assertion the court permissibly found but one aggravating factor—that he was convicted of crimes as to which consecutive sentences could be imposed (rule 4.421(a)(7))—and had the trial court weighed that single factor against the "super mitigant," it would have imposed the low term under section 1170, subdivision (b)(6). In any case, this argument assumes *all* of his challenges to the aggravating factors have merit, but we have concluded otherwise. In our view, the trial court did not err in determining defendant suffered numerous prior convictions (rule 4.421(b)(2)) and performed poorly on prior grants of probation (rule 4.421(b)(5)). However, the court did err by relying

on the jury's gun use aggravation finding (rule 4.421(a)(2)) to justify imposing a midterm sentence, rather than the low term sentence otherwise required under subdivision (b)(6), and reversal and remand is required for that reason, alone.

## DISPOSITION

The matter is remanded for a new sentencing hearing.  The clerk shall prepare an amended minute order.  In all other respects, the judgment is affirmed.

BANKE, J.

WE CONCUR:

HUMES, P. J.

LANGHORNE WILSON, J.

*(People v. Morgan; A166435)*

40

## *People v. Morgan* (A166435)

Trial Court:      Sonoma County Superior Court

Trial Judge:      Hon. Bradford DeMeo

Attorneys:

      Michael Edward Allen, under appointment by the First District Court of Appeal, for Defendant and Appellant.

      Rob Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, David H. Rose, Deputy Attorney General for Plaintiff and Respondent.